Filed 10/19/18; Certified for Publication 11/15/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| HIGH SIERRA RURAL ALLIANCE, | |
| Plaintiff and Appellant, | C082315 |
| v. | (Super. Ct. No. CV1400009) |
| COUNTY OF PLUMAS, | |
| Defendant and Respondent. | |

Encompassing more than 1.67 million acres, Plumas County (County) is geographically large.  As a matter of population, however, the County is small – with only 20,007 residents.  The County's population actually shrank during the decade between 2000 and 2010, when it experienced a net loss of 817 residents.  Little future population growth is expected.  The California Department of Finance has estimated the County's population will remain under 21,000 until 2025, at which point the population is expected to *decline*.  This minimal expected population growth serves as a backdrop to the County's multi-year process of preparing a general plan update and accompanying

1

environmental impact report (EIR) under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA).[1]

The general plan update and final EIR were adopted by the County's board of supervisors (Board) in December 2013. The general plan update expressed the aim of focusing new population growth and housing construction to that within "planning areas" in order to preclude urban sprawl and degradation of natural resources. Outside of the planning areas, the County's general plan update and final EIR expect little growth or construction to occur in the foreseeable future.

This case involves challenges by the High Sierra Rural Alliance (High Sierra) to the County's general plan update and the final EIR. All of High Sierra's challenges related to these documents' treatment of possible growth outside of the County's planning areas. Specifically, High Sierra contends (1) the County's general plan update violates the California Timberland Productivity Act of 1982 (Gov. Code, § 51100 et seq.; Stats. 1982, ch. 1489, § 2, p. 5750) (Timberland Act) by determining a residence or structure on a parcel zoned as a timberland production zone is necessarily compatible with timber operations, (2) the general plan update's determination that a residence or structure on a timberland production zone parcel is compatible with its designated use – even in the absence of a requirement the residence or structure be "necessary to the management of land zoned as timberland production" – violates Government Code section 51104, (3) the County violated CEQA by failing to properly address the potentially significant impacts of allowing construction of multiple buildings covering up to two acres on a single parcel without any discretionary review or mitigation policies to protect the environment, (4) the County's EIR is defective because it did not properly

---

[1]     Undesignated statutory references are to the Public Resources Code.

describe or disclose the potentially significant impacts of allowing new clustered subdivision development in rural areas under general plan update policy number LU-1.1.4, and (5) the County should be required to recirculate the final EIR because the County added significant information regarding development after the close of the public comment period.

We conclude the County's general plan update does not violate the Timberland Act by failing to recite the statutory language in Government Code section 51104. Government Code section 51104 suffices to supply the restrictions on residences and structures on timberland production zone parcels. And the County's EIR is not deficient for lack of study regarding the effects of section 51104 on the construction of residences and structures in timberland production zone parcels. We also conclude the EIR adequately analyzed reasonably foreseeable development within the County, including impacts that can be expected outside the planning areas. Steady to declining population combined with policies designed to limit growth outside the planning areas supported the EIR's determination that little development would occur in the manner feared by High Sierra. We agree with the trial court that the County reasonably crafted the EIR as "a first-tier environmental document that assesses and documents the broad environmental impacts of a program with the understanding that a more detailed site-specific review may be required to asses future projects implemented under the program."

Accordingly, we affirm the judgment.

BACKGROUND

*Plumas County Geography*

Plumas County encompasses 2,613 square miles or 1,672,119 acres. Approximately 65 percent of the County is comprised of public lands managed by the United States Forest Service. Another 6 percent is owned and managed by state and County agencies. Approximately 29 percent of the County is privately owned, and of the

3

privately owned lands, 33.4 percent is located within the County's planning areas.  As a consequence, "Plumas County has little direct control over much of the property within its jurisdiction."  Development in the County is further constrained by the "rugged topography [which] includes rivers, forests and mountainous terrain that are critical to the County's rural character."  Further, the County has imposed additional constraints in the form of policies that preclude loss of wetlands and other sensitive habitats.

*Plumas County Population Forecast*

Plumas County is populated by small communities ranging from fewer than 100 to more than 4,000 residents.  The City of Portola is the only incorporated city in the County and has a population of 2,069 people.  The 2010 United States census determined Plumas was one of only three California counties to have experienced a net loss in population.  Between 2000 and 2010, the County had a net loss of 817 residents.

The County's EIR analysis relied on population growth statistics from the California Department of Transportation (Caltrans).  In 2009, Caltrans forecast population growth for the County amounting to only 0.7 percent annually through 2050.  The California Department of Finance has projected a population increase to 20,741 by 2025, and then a decrease of population to 20,401 by 2035.  On this basis, the draft EIR noted that "[g]iven the historic county growth rate and the development patterns established under the proposed project, it would be highly unlikely and next to impossible for every parcel in the County to develop to its maximum potential within the 2035 planning horizon.  Therefore, the [draft] EIR analysis focuses on growth that is reasonably foreseeable to occur within the 2035 planning horizon."

*General Plan Update*

In 1984, the County adopted a general plan that was not comprehensively updated until efforts were begun in 2005 to formulate the general plan update that is the subject of this appeal.  The general plan update uses 2035 as a planning year horizon and addresses

4

issues of existing and anticipated development within the County. The general plan update is intended to provide the County's overarching approach to development and "is not intended to provide the level of detail that is found in an ordinance or special use permit condition."

In 2011, the County completed an administrative draft plan. The administrative draft plan proposed that most future development be focused within "planning areas," that are defined as " 'urban' growth boundary for each Town, Community, Rural Place, or Master Planned Community in the County. A Planning Area boundary encompasses the existing developed land area (the core), potential land area (expansion area) available for future growth of a Town or a Community. For Rural Places and Master Planned Communities, the Planning Area boundary is also the core boundary because there is no identified and mapped expansion area for these two community types." By contrast, "Rural Places are defined as having little to no public infrastructure and services." The administrative draft plan expressed an aim to "protect agricultural and ranching lands, open space, and natural resources which include: grazing, forests, and wildlife habitat lands, by not allowing land divisions intended for residential use to be developed in areas which are not specifically designated as residential in the General Plan, for which appropriate long-term planning has not been completed as outlined within the General Plan."

As pertinent to the issues presented in this appeal, the County's general plan update declares that "[t]he County shall require future residential, commercial and industrial development to be located adjacent to or within existing Planning Areas . . . ." As the County's final EIR explains, "[t]he assumption in both the General Plan Update and Draft EIR that future growth will be focused within County Planning Areas was based on a combination of historic development patterns (demonstrating a majority – over 90% – of total issued building permits, of historic growth occurring within County

5

Planning Areas) . . . ."  The County determined that "only 88 parcels were created outside of designated Planning Areas between the years 2000 and 2010.  Of the total number of building permits for dwelling units during that same period (1,656 permits), only 55 permits were issued outside designated Planning Areas."

### *EIR Analysis of the County's General Plan Update*

The County issued a draft EIR in support of the County's general plan update. Both the general plan update and the County's EIR analysis encompassed the entirety of the County's geographic area.  The County deemed its analysis a programmatic EIR serving "as a first-tier environmental document that assesses and documents the broad environmental impacts of a program with the understanding that a more detailed site-specific review may be required to assess future projects implemented under the program."

The general plan update and the County's EIR "reflected land use patterns and growth projections with a continued focus on growth within County Planning Areas."  To this end, the general plan update "[d]irects new development to Planning Areas to support future economic growth and facilitate the efficient provision of new infrastructure and public services . . . ."  The County's assumption that "future growth will be focused within County Planning Areas was based on a combination of historic development patterns within Plumas County and existing General Plan policies, as well as new objectives and policies that were developed after an extensive public involvement process associated with the General Plan update.  The County recognizes that some amount of new development will occur outside these planning areas, though the amounts at issue are likely to be very modest due to (i) historical trends and (ii) restrictive new (proposed) policies."  Based on the data regarding past growth, the County's EIR concluded most future development will occur within the planning areas.

6

## *Procedural History*

The County developed the objectives for the general plan update through substantial community input that included 10 public meetings, 15 citizen working group sessions, and more than 20 work sessions with the County's planning commission. The County also held two public scoping sessions and a public comment session relating to the draft EIR for the general plan update.

In November 2011, the Board adopted the general plan update as the project description for purposes of CEQA review. The County published a notice of preparation in January 2012. Numerous comments were received on the draft EIR that was submitted to the state clearinghouse for public review in November 2012. The County held a public hearing on the final EIR in July 2013, which was continued to include another session for public comments. The Board held a public hearing on the general plan update and final EIR in November 2013. The County's staff then prepared a supplemental report that was deemed to be an addendum to the final EIR.

In December 2013, the Board passed resolutions certifying the final EIR, adopting the general plan update, making findings of fact under CEQA, and adopting a statement of overriding consideration.

In August 2015, High Sierra filed a petition for writ of mandate and complaint to challenge the Board's adoption of the general plan update and the final EIR. The trial court heard the matter in February 2016, and denied the petition and complaint in its entirety. The trial court determined the EIR's project description was appropriate for a first-tier environmental document, substantial evidence supported the conclusion that "the County's policies and mitigation measures in the EIR . . . will help reduce the severity of any adverse environmental impacts of future projects," the omission of maps from the draft EIR did not constitute prejudicial error under CEQA, High Sierra "fail[ed] to state valid grounds for recirculation" under CEQA, County Policy AG/FOR 8.9.1 does not

7

conflict with the Timberland Act, and recirculation was not necessary for the addition of building intensity standards to the final EIR.

From the judgment of dismissal, High Sierra filed a timely notice of appeal.

DISCUSSION

I

### *Timberland Protection Zone Challenge*

High Sierra raises two issues under the Timberland Act.  The gravamen of High Sierra's arguments are not entirely clear because the statement of issues presented does not match the gist of the argument provided in the opening brief.  These issues differ again from their presentation by High Sierra in its reply brief.[2]  In any event, both arguments raised in the opening brief turn on the meaning of Government Code section 51104.  As we explain, we are not persuaded by either argument.

### A.

### *Principles of Statutory Construction*

In construing a statute, our primary goal " ' "is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute."  . . .  We begin as always with the statute's actual words, the "most reliable indicator" of legislative intent,

---

[2]  For example, High Sierra's reply brief presents for the first time another argument that the discretionary nature of review of permitting residences on timberland production zoned land is a project under CEQA that must be studied in an EIR.  This argument is forfeited.  New arguments may not be raised for the first time in an appellant's reply brief.  " 'Obvious considerations of fairness in argument demand that the appellant present all of his [or her] points in the opening brief.  To withhold a point until the closing brief would deprive the respondent of his [or her] opportunity to answer it or require the effort and delay of an additional brief by permission.  Hence the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before.' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764, quoting *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

8

"assigning them their usual and ordinary meanings, and construing them in context." ' (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837–838.) If the words appear susceptible of more than one reasonable construction, we look to other indicia of legislative intent, bearing in mind the admonition that '[t]he meaning of a statute may not be determined from a single word or sentence' (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735) and that apparent 'ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes' (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871). (See *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1393 (conc. opn. of Cuéllar, J.) ['[U]nderstanding whether [a statute's] meaning is plain is not a project well served by reading statutory provisions as isolated fragments'].)" (*People v. Pennington* (2017) 3 Cal.5th 786, 795.)

## B.

### *Whether the General Plan Update Conflicts with the Timberland Act*

High Sierra asserts the "County's approval of the general plan update violates the state Timber Law by determining that all residences must be treated as 'compatible uses' on [timberland production zone] parcels." In High Sierra's view, "[t]his categorical determination that a residence or structure is a 'compatible use' on [timberland production zone] lands is, however, contrary to state law, which requires the County to make that decision on a case by case basis according to whether the residence is 1) 'necessary for' the management of land zoned as timberland production, see Govt. Code § 51104(h)(6); and 2) not otherwise incompatible with the underlying timber operations." (Italics omitted.) In support of the argument, High Sierra cites only two pages in the administrative record: (1) the Board's findings in support of the policy governing minimum lot sizes for timber production zone land, and (2) the resulting policy adopted

9

by the County's Board.  Having elected to contest only the extent to which these two pages establish the County's violation of the Timberland Act, we limit our review accordingly.  Upon examination, we conclude neither the findings nor the adopted policy of these two pages conflicts with the Timberland Act.

### 1.  The Timberland Act

The Timberland Act represents the Legislature's declared intent "to fully realize the productive potential of the forest resources and timberlands of the state, and to provide a favorable climate for long-term investment in forest resources, it is the policy of this state to do all of the following:  [¶]  (1) Maintain the optimum amount of the limited supply of timberland to ensure its current and continued availability for the growing and harvesting of timber and compatible uses.  [¶] (2) Discourage premature or unnecessary conversion of timberland to urban and other uses.  [¶]  (3) Discourage expansion of urban services into timberland."  (Gov. Code, § 51102, subd. (a)(1)-(3).)

The Timberland Act imposes mandatory restrictions on parcels zoned as timberland production.  Such parcels "shall be zoned so as to restrict their use to growing and harvesting timber and to compatible uses."  (Gov. Code, § 51115.)  To this end, the Timberland Act provides that "[t]he growing and harvesting of timber on those parcels shall be regulated solely pursuant to state statutes and regulations."  (*Ibid.*)  Even so, counties play a role under the Timberland Act because they are charged with the duty to enforce the Timberland Act's provisions.  Government Code section § 51118 provides:  "Land zoned as timberland production under this chapter shall be enforceably restricted within the meaning of Section 3(j)[3] of Article XIII of the Constitution and the

---

**3**     Article XIII, section 3, subdivision (j), of the California Constitution provides: "Immature forest trees planted on lands not previously bearing merchantable timber or

restriction shall be enforced and administered by the city or county in a manner to accomplish the purposes of that section and this chapter." (Gov. Code, § 51118; see also § 51116 ["The county or city may bring any action in court necessary to prohibit a use not permitted with respect to land zoned as timberland production, including, but not limited to, an action to enforce the zoning restrictions by specific performance or injunction"].)

In addition to the cultivation of timber stock, the Legislature has enumerated uses for timberland production zoned parcels that are compatible with the intent of the Timberland Act. These compatible uses are defined in subdivision (h) of Government Code section 51104 that provides: " 'Compatible use' is any use which does not significantly detract from the use of the property for, or inhibit, growing and harvesting timber, and shall include, but not be limited to, any of the following, unless in a specific instance such a use would be contrary to the preceding definition of compatible use: [¶] (1) Management for watershed. [¶] (2) Management for fish and wildlife habitat or hunting and fishing. [¶] (3) A use integrally related to the growing, harvesting and processing of forest products, including but not limited to roads, log landings, and log storage areas. [¶] (4) The erection, construction, alteration, or maintenance of gas, electric, water, or communication transmission facilities. [¶] (5) Grazing. [¶] (6) *A residence or other structure necessary for the management of land zoned as timberland production*." (Italics added.)

---

planted or of natural growth on lands from which the merchantable original growth timber stand to the extent of 70 percent of all trees over 16 inches in diameter has been removed. Forest trees or timber shall be considered mature at such time after 40 years from the time of planting or removal of the original timber when so declared by a majority vote of a board consisting of a representative from the State Board of Forestry, a representative from the State Board of Equalization, and the assessor of the county in which the trees are located."

11

High Sierra contends the County's general plan update conflicts with the italicized language in Government Code section 51104.

### 2. *The County's General Plan Update Policies Regarding Timberland Usage*

The record demonstrates the Board was well aware timberland production zones within the County are governed by the Timberland Act. In addressing the issue of timberland production zones within the County, the Board adopted the planning commission's recommended findings, including the following:

> "**Findings regarding Policy AG/FOR -8.9.1 Minimal Parcel Size for Timber Resource Lands**
>
> "The Board finds a residence or other structure on land zoned as timberland production is a permitted use under the Act [GC 51104]. A residence or other structure is a permitted use under the Plumas County Code [PCC 9-2.3202(b)(7)]. Implementation measure AG/FOR 13.b. permits those uses listed in the California Timberland Productivity Act of 1982, as well as other related and compatible uses that may be conditionally permitted. Compatible uses are those established by ordinance of the County and defined in the [general plan update] as 'Uses that are capable of existing together without conflict. In terms of the California Timberland Productivity Act of 1982, a compatible use is defined as any use which does not significantly detract from the use of the property for, or inhibit, growing and harvesting timber.' A residence or a structure permitted uses with both uses allowed on a parcel 160 acres or larger, which is zoned Timber Production Zone. A residence or [structure][4] is a permitted use in Plumas County Code and considered a 'compatible use' by the County, it does not need to be established by Special Use Permit."

---

[4] Based on the language of Government Code section 51104, it appears the word "structure" is inadvertently omitted from the Board's adopted findings.

12

Based on these findings, the Board adopted policy 8.9.1 to confirm a residence or structure on a parcel of land zoned for timberland production is a compatible use so long as the parcel is at least 160 acres.

"**8.9.1 Minimum Parcel Size for Timber Resource Lands**

"The minimum parcel size for Timber Resource lands shall be 40 acres. Timber Resource Lands include those lands identified as General Forest (Zoning District) and as Timberland Production Zone (Zoning District). Limitations provided by the zoning include a restriction of the allowable density of dwelling units in the Timberland Production Zone. Only parcels 160 acres in size or greater are allowed a residence or structure."

This policy is one of the two specific parts of the record that High Sierra challenges. The other part of the record that High Sierra challenges is the Board's adoption of policy 8.9.2 to confirm timberland production zones be dedicated to production of timberland and its compatible uses:

"**8.9.2 Compatible Uses for Timber Resource Lands**

"Timber Resource lands shall only be used for purposes that are compatible with timber production such as the production of other wood products, bio-mass, mineral resource extraction, grazing, recreation, carbon sequestration and wildlife habitat/migratory corridors."

Consequently, we proceed to consider how these policies in the County's general plan update relate to or conflict with the Timberland Act.

***Whether the General Plan Update Conflicts with the Timberland Act in Determining a Necessary Residence or Structure to be a Compatible Use***

High Sierra contends, "the County's determination that a residence or structure is a compatible use on [timberland production zoned] lands is contrary to the Timberland Production Act." High Sierra elaborates on its view that "the general plan update's categorical determination that a residence or structure is a 'compatible use' on

13

[timberland production zoned] lands is . . . contrary to state law, which requires the County to make that decision on a case by case basis according to whether the residence is 1) 'necessary for' the management of land zoned as timberland production, see Govt. Code, § 51104(h)(6); and 2) not otherwise incompatible with the underlying timber operations."

The County largely *agrees* with High Sierra's argument. Specifically, the County notes the general plan update "does not change the County's previous practice under the 1984 General Plan of allowing a residence *necessary and compatible* with the management of 160 acres or greater parcels of [timberland production zoned] lands to be approved in a ministerial process." (Italics added.) The record supports the County's representation that the general plan update comports with the "necessary and compatible" use definition of Government Code section 51104.

During a public meeting, the County's planning director, Randy Wilson, informed the Board: "The language 'structure if necessary for management of the parcel' is -- actually out of state law and current zoning code. The request is that – that language is not necessary. Staff is supportive of ending that policy after the word 'residence' or striking 'or structures if necessary for the management of the parcel.' " Thus, the County's planning director indicated the "necessary for management of the parcel" requirement for a residence or structure on timberland production zoned land was compelled by statute and therefore did not require redundant specification by the general plan update. A further colloquy during the Board's meeting showed the understanding the general plan update was exactly coextensive with the Timberland Act because Wilson indicated a change in the state law would necessarily change land use in the County:

"RANDY WILSON: It's redundant to state law. So, we're supporting removing that one.

14

"COUNTY COUNSEL CRAIG SETTLEMIRE: But if state law were to change--

"RANDY WILSON: It could change—"

High Sierra does not identify anywhere in the general plan update or the EIR that the County has adopted a policy of allowing residences and structures on timberland production zoned land in violation of the Timberland Act. Instead, the general plan update defers to the Timberland Act on the issue of compatible uses for timberland production zoned lands. We reject High Sierra's implication the general plan update must recite the "necessary for the management of land zoned as timberland production" language in subdivision (h) of Government Code section 51104. The County does not have discretion to waive the requirements of the Timberland Act relating to compatible uses. (Gov. Code, §§ 51104, 51115 ["The growing and harvesting of timber on those parcels shall be regulated solely pursuant to state statutes and regulations"].)

In reply to the County's assurances it will follow state law to allow only residences and structures necessary to the management of timberland production zoned lands, High Sierra expresses doubt the County will really enforce this requirement in the Timberland Act. Indeed, the gist of High Sierra's concerns appears to be the County is simply "disingenuous" about its intent to follow state law. This concern, however, does not present a ripe claim for purposes of justiciability. High Sierra cites no evidence County staff are ignoring the requirements of the Timberland Act under the general plan update. And High Sierra has not presented a proper argument or record regarding the *manner* in which the County assesses whether a residence or structure is necessary to the management of timberland production zoned lands. A challenge to the County's implementation of its general plan is not yet ripe. (See *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582 [rejecting as unripe claim regarding possible condemnation of property when the city had not yet committed to any action regarding the property].) And as to the claim the general plan update itself violates the

15

Timberland Act, we determine High Sierra has not shown general plan update policies 8.9.1 or 8.9.2 conflict with state law.

### 4. *Whether the General Plan Update Conflicts with the Timberland Act in Determining a Residence or Structure to be Exempt from County Permitting Requirements*

High Sierra next contends the County's general plan update conflicts with the Timberland Act because the update provides, "residences may be permitted as a ministerial use on [timberland production zoned] lands . . . ." More specifically, High Sierra asserts that "the County *must* exercise discretionary authority to make the required findings" under Government Code section 51104, subdivision (h), that a residence or structure is necessary for the management of the timberland production zoned parcel.

Again, the County largely *agrees*. The County acknowledges it must make a finding of necessity for any residence or structure to be constructed on timberland production zoned lands. The record supports the County's position in its briefing on appeal. During the process of adopting the general plan update, County "[s]taff confirmed that the County will continue to make the 'required state law finding' that a residence be necessary for the management of the parcel." The general plan update itself declares, "Timberlands within a Timber Production Zone shall be regulated as to use and subdivision as set forth in the Act."

However, as the County points out, the finding that a residence or structure is necessary for the management of a timberland production zoned parcel is not an exercise of discretion as used in the CEQA context. Under subdivision (h) of Government Code section 51104, the County's compatibility determination must rest on whether the residence or structure is necessary and "does not significantly detract from the use of the property for, or inhibit, growing and harvesting timber . . . ." This consideration of

16

compatibility under the Timberland Act is not constrained, or even informed, by CEQA. Under Government Code section 51119, the Timberland Act expressly exempts from CEQA review any decision of a county board of supervisors to place parcels into timberland production zones. Because placement of parcels into a timberland production zone necessarily involves the state law's authorization of residences and structures necessary for the management of these parcels, the findings of compatibility are governed solely by the Timberland Act.

The statutory guidance given by the Timberland Act for determining whether a residence or structure is necessary for the management of a timberland production zone parcel is the reason why the discretionary review paradigm of CEQA analysis does not apply. In *Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, the court explained, "[t]he functional distinction between 'ministerial' and 'discretionary' projects under CEQA." (*Id.* at p. 272.) The *Westwood* court addressed the question, "why it makes sense to exempt the ministerial ones from the EIR requirement." (*Ibid.*) "The answer is that for truly ministerial permits an EIR is irrelevant. No matter what the EIR might reveal about the terrible environmental consequences of going ahead with a given project the government agency would lack the power (that is, the discretion) to stop or modify it in any relevant way. The agency could not lawfully deny the permit nor condition it in any way which would mitigate the environmental damage in any significant way. The applicant would be able to legally compel issuance of the permit without change. Thus, to require the preparation of an EIR would constitute a useless— and indeed wasteful—gesture." (*Ibid.*)

Consequently, we reject the argument advanced by High Sierra at oral argument to the effect that the determination of whether a residence or structure is necessary for a timberland production zoned parcel creates a new ministerial process that effectively grants automatic approval of new housing in rural Plumas County. The Timberland Act

17

limits residences and structures to only those that are *necessary* to the management of a timberland zoned parcel. (Gov. Code, § 51104, subd. (h)(6).) The County must still make a determination that the proposed structure is necessary within the meaning of Government Code section 51104. Moreover, the County's general plan limits structures to only those parcels of timberland zoned parcels that are 160 acres in size or greater. And the County requires that there be "no net loss" of timber resources in the construction of the proposed structures. In short, the standard imposed by state law under the Timberland Act does not – as High Sierra suggests – constitute a new effort by the County to allow rural development on timberland zoned lands.

Even so, once the County has made the finding a residence or structure is necessary to the management of a timberland production zoned parcel, the Timberland Act affords the County no discretion to stop or request modification of the proposed residence or structure in order to mitigate environmental impacts. (§ 51104, subd. (h)(6).) Consequently, we reject High Sierra's contention the County is required to engage in discretionary review under CEQA for proposed structures that are compatible with timberland production zoned parcels as defined by Government Code section 51104, subdivision (h).[5]

---

**5** We are not called upon to interpret the criteria that might inform a finding of necessity under Government Code section 51104, subdivision (h); the manner in which the County can or should make such a finding; or the manner in which an enforcement action can or should be brought to ensure compliance with Government Code section 51104 for a specific, proposed residence or structure. As noted above, High Sierra challenges the general plan update as itself violative of the Timberland Act. For this reason, we do not address the contention regarding the manner in which a residence or structure is found to be a compatible use under Government Code section 51104 as argued by amici curiae, Plumas/Sierra Chapter of the Citizens' Alliance for Property Rights, Forest Land Owners of California, Central Coast Forest Association, and Humboldt Coalition for Property Rights.

## II

### *EIR Analysis of Expected Development Outside the County's Planning Areas*

High Sierra contends the County's EIR in support of the general plan update "does not assess the impacts of development occurring *outside* designated 'Planning Areas' . . . ." High Sierra argues the general plan update invites "dwellings and structures that may overlie up to *two acres per parcel* on a host of land use categories representing thousands of parcels," and that "the development potential of resource lands now eligible for subdivision development under the new [general plan update] policy is *enormous*." High Sierra's contentions are not supported by the reasonably foreseeable development within the County, including impacts that can be expected outside the planning areas. We conclude the EIR adequately addressed the impacts of development outside the planning areas.

### A.

### *Review of CEQA Claims*

As the California Supreme Court has explained, "In determining whether to grant a petition for traditional mandamus on the ground that an administrative body failed to comply with CEQA in making a quasi-legislative decision, the court may consider only 'whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (. . . § 21168.5.)" (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 568.)

---

We also deny as unnecessary to the disposition of this opinion, High Sierra's request for judicial notice filed on June 7, 2017, and the County's request for judicial notice filed on February 21, 2017.

19

Here, High Sierra challenges the adequacy of the County's EIR analysis in support of its general plan update. "With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. (§ 21100 [state agencies], § 21151 [local agencies], Guidelines, § 15002, subd. (f)(1).)"**6** (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-391 (*Laurel Heights I*), fn. omitted.) As the *Laurel Heights I* court noted, "The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project *is likely to have on the environment*; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (§ 21061; Guidelines, § 15003, subds. (b)–(e).)" (*Laurel Heights I, supra,* 47 Cal.3d at pp. 390-391, italics added and fn. omitted.)

The *Laurel Heights I* court elaborated that "an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a *reasonably foreseeable* consequence of the initial project; and (2) the future expansion or action will be significant in that it will *likely* change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Id.* at p. 396, italics added.) "We do not require prophecy. . . . Nor do we require discussion in the EIR of specific future action that is

---

**6**      Citations to Guidelines refer to title 14, sections 15000 and following, of the California Code of Regulations that implement the provisions of CEQA. "These Guidelines are binding on all public agencies in California." (Guidelines, § 15000; accord *Laurel Heights I, supra*, 47 Cal.3d at p. 391, fn. 2.)

20

merely contemplated or a gleam in a planner's eye. . . . A detailed environmental analysis of every precise use that may conceivably occur is not necessary at this stage." (*Id.* at p. 398.) Consequently, our "[r]eview is confined to whether an EIR is sufficient as an informational document. 'The court must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA. [Citation.] [¶] CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." [Citation.]' " (*El Morro Community Ass'n v. California Dept. of Parks and Recreation* (2004) 122 Cal.App.4th 1341, 1349, quoting *Defend The Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265.)

Our review does not encompass " 'the correctness of the EIR's environmental conclusions, but only its sufficiency as an informative document. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta Valley*).) "We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' [Citation.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (*Ibid.*)' " (*North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors* (2013) 216 Cal.App.4th 614, 623, quoting *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1447.)

21

## B.

### *Claim that the County has Failed to Disclose Foreseeable Rural Sprawl*

The gist of High Sierra's arguments regarding the alleged inadequacies of the County's general plan update and EIR is that these documents invite unmitigated "rural sprawl in the form of small subdivisions" that will result in thousands of new residences and large structures outside of the designated planning areas. High Sierra contends, "the EIR's failure to acknowledge and address the rural sprawl that will foreseeably arise due to the County's new policies prevents any of these issues [affecting the environment] from being effectively addressed in a coherent manner that informs and discloses to the public the potential impacts of [the general plan update] over the next two decades." We are not persuaded.

It is not enough that High Sierra might be able to present an interpretation of policies adopted in the general plan update that allows developers to erect thousands of new residences or structures. This is because "it has been held that an EIR is not required to engage in speculation in order to analyze a 'worst case scenario.' " (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 373, quoting *Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671.) Although High Sierra imagines a worst case scenario for rural sprawl in Plumas County, it does not demonstrate the County erred in relying on its experience and data showing minimal growth outside the planning areas would occur in the reasonably foreseeable future.

To the contrary, the record discloses substantial evidence in support of the County's population growth and property development estimates. The County relied on estimates formulated by the Department of Finance and Caltrans to determine the County's population may reasonably be expected to grow by only 0.7 percent annually through 2050. In doing so, the County considered the timing and manner in which the

Department of Finance and Caltrans estimates were formulated. The County also compared these future population estimates with the census data showing the County's past population growth and contraction. High Sierra's opening brief ignores these forecasts of very limited population and development growth outside of the planning areas the data and historical data support.

Based on the minimal rate of growth forecast for Plumas County, the draft EIR calculated that "full build-out resulting from implementation of the proposed project" would require "over a three hundred year timeframe (year 2320)." This timeframe being impracticable to study, the County studied the reasonably foreseeable effects of the general plan update through the year 2035. Within the period ending in 2035, the draft EIR noted full build-out is "highly unlikely and next to impossible for every parcel in the County to develop to its maximum potential . . . ." Thus, the County's EIR analysis "focuses the impact analysis on *reasonably foreseeable growth* or that occurring during the 2035 Planning Horizon." (Italics added.)

The County determined reasonably foreseeable growth will occur almost exclusively within the planning areas. On this point, the County found, "[t]here was no evidentiary basis or reason to assume an abrupt change in consumer preferences favoring a growth shift outside of identified County Planning Areas going forward." In addition to basing this conclusion on population forecasts, this expectation was "confirmed during the proposed project's extensive public outreach process . . . ." This conclusion was further supported by historic land use data showing that "only 88 parcels were created outside of designated Planning Areas between the years 2000 and 2010. Of the total number of building permits for dwelling units during that same period (1,656 permits), only 55 permits were issued outside designated Planning Areas." As the County noted, this time period included a "boom" and recession in real estate development. The County further noted that "most of the above-referenced 88 parcels . . . approved in the last

23

decade could not be approved under the proposed General Plan Update due to a lack of fire protection infrastructure . . . ." The requirement for fire protection infrastructure for new development is set forth in general plan update policy number LU-1.1.4, regarding which the County explained:

"[P]roposed policies that would limit new subdivisions to areas that are served by fire protection, which is one of the key criteria included in Policy LU-1.1.4. The policy is provided below:

> "Policy LU-1.1.4 Land Divisions. The County shall ensure that zoning and subdivision regulations protect agricultural and ranching lands, open space, and natural resources which include: grazing, forests, and wildlife habitat lands, by not allowing land divisions that convert the primary land use to residential to be developed in areas which are not specifically designated as residential in the General Plan, for which appropriate long-term planning has not been completed as outlined within the General Plan. The County shall require the following findings for land divisions outside of Planning areas: [¶] The resulting development will have structural fire protection; [¶] Land division does not result in any conflict with zoning and density standards, and [¶] Any clustering of parcels does not convert the primary land use to residential and is part of an overall integrated plan for resource protection.
>
> "As the language of this policy makes clear, the [general plan update] would allow growth outside the Planning Areas, but would require fire protection for any subdivisions outside these areas, which will have the predictable effect of greatly limiting the number of subdivisions that could occur in remote areas. This new requirement, combined with landowners' above-described historical tendencies to seek to develop lands within the Planning Areas, justifies the County's expectation that the vast majority of new development will occur in the Planning Areas." (Bold typeface and bullet points omitted.)

Rather than seeing policy number LU-1.1.4 as restrictive in disallowing development in the absence of structural fire protection infrastructure, High Sierra contends this policy opens the floodgates to "residential subdivisions to be created on

24

literally *thousands of acres* in agricultural, timber and mining lands located in remote areas of the County."

We reject High Sierra's interpretation of general plan update policy number LU-1.1.4. This policy has the express aim of protecting rural areas "by not allowing land divisions that convert the primary land use to residential . . . ." General plan update policy number LU-1.1.4 imposes restrictions on residential development to areas with existing structural fire protection infrastructure, consistent with all zoning and density standards, and comport with a plan for resource protection. Nothing in policy number LU-1.1.4 can be read to allow unmitigated development as envisaged by High Sierra. Even if it could so be read, the record supports the County's conclusion that there is no evidence there will be any sudden demand for residential development outside of the planning areas. In response to a comment on the draft EIR that "the land use policies allow for an *unlimited* number of new communities outside of Planning Areas in undisclosed locations," the County stated there was "no data" to support the concern.

Even while concluding most future development would occur within the planning areas, the County acknowledged some development would take place in outlying areas. The final EIR explained, "The County recognizes that some amount of new development will occur outside these planning areas, though the amounts at issue are likely to be minimal due to (i) historical trends and (ii) restrictive new (proposed) policies . . . ." However, the expected scope of this development is limited. As the County noted that "[d]evelopable land within the County is limited. First, one must consider that Plumas County has jurisdiction over less than 30 percent of the total land area within the County boundaries. For example, the U.S. Forest Service manages approximately 65 [percent] of the lands in Plumas County, lands on which private development cannot occur. As an additional constraint to development, much of Plumas County consists of

25

landscapes that are identified for protection from development (see Policy COS-7.1.2), such as ridgelines, hazard areas, wetlands, lakes, rivers and riparian corridors, forests and other landscapes that are critical to the continuation of the County's rural character (see Policy COS-7.1).  Policies requiring no net-loss of Wetland habitats/other sensitive habitats (see policies COS-7.2.6 and COS-7.2.2), prohibiting uses that are incompatible with long-term agricultural production (see Goal 8.2 and associated policies), and requiring the preservation of visual resources (see policies COS-7.6.1 and COS-7.6.2) are all examples of constraints on development that, when viewed in total (see previous paragraph), limit where and how much development can occur on the private lands within the County."

In its opening brief, High Sierra does not challenge the County's conclusion that population and growth in Plumas will be very modest for the reasonably foreseeable future.  High Sierra also does not acknowledge the County's data and conclusion that no reason for any abrupt change in growth from inside to outside the planning areas can be discerned.

In its reply brief, High Sierra asserts the County's study of expected growth includes an acknowledgement that some future vacation home development will occur in Plumas.  The assertion supports rather than undermines our conclusion the County's EIR properly defined the scope of the project by expressly noting *some* development will occur outside the planning areas.  The County's EIR does not rest on an assumption no vacation home development or other new construction will take place outside the planning areas.  Instead, the County accounted for this development and concluded, based on the historical data and future projections, that this small amount of development would be better analyzed in site specific manner than in a first tier programmatic EIR.

26

We reject High Sierra's repeated reliance on a working paper issued in 2010 by Bruce M. Burger and Randy Carpenter titled, "Rural Real Estate Markets and Conservation Development In the Intermountain West: Perspectives, Challenges and Opportunities from the Great Recession." The focus of the working paper was on conservation development approaches that were "particularly relevant to areas in the Northern Rockies." Thus, the paper drew most of its data from Colorado, Montana, and Idaho–to the exclusion of any cited data specific to Plumas County. Consequently, the working paper does not cast doubt on the County's data and experience that supported its growth forecasts.

In essence, High Sierra's challenges to the sufficiency of the County's EIR analysis all rest on an unsupported assumption of rampant future growth in a County where population is expected to begin shrinking during the project's time period. As an informational document, the County's EIR is required to study only reasonably foreseeable consequences of the general plan update. (*Laurel Heights I, supra*, 47 Cal.3d at pp. 390-391.) CEQA does not require an agency to assume an unlikely worst-case scenario in its environmental analysis. Here, the reasonably foreseeable lack of demand and development supports our conclusion the EIR sufficed as an informational document consistent with CEQA.

## IV

### *Failure to Recirculate the EIR*

High Sierra argues the "County violated CEQA by failing to recirculate the EIR due to significant new information regarding the project and project EIR after the close of public comment." High Sierra's argument appears to center on two assertions: (1) "The [draft EIR] presented to the public presented future development as occurring solely within the Planning Areas." (2) "Recirculation is also required due to the Draft Plan's

27

and EIR's failure to contain or disclose building intensity standards." The arguments are not persuasive.

## A.

### *CEQA Requirements for Recirculation of an EIR*

In evaluating High Sierra's argument, we begin with the CEQA Guidelines on recirculation of an EIR. On this point, subdivision (a) of Guidelines section 15088.5 provides: "A lead agency is required to recirculate an EIR when significant new information is added to the EIR after public notice is given of the availability of the draft EIR for public review under Section 15087 but before certification. As used in this section, the term 'information' can include changes in the project or environmental setting as well as additional data or other information. New information added to an EIR is not 'significant' unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement. 'Significant new information' requiring recirculation include, for example, a disclosure showing that: [¶] (1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented. [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance. [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it. [¶] (4) The draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and

28

comment were precluded. (*Mountain Lion Coalition v. Fish & Game Com.*(1989) 214 Cal.App.3d 1043)." (Guidelines, § 15088.5.)

Subdivision (b) of Guidelines section 15088.5 provides that "[r]ecirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR."

Finally, we note that "[a] decision not to recirculate an EIR must be supported by substantial evidence in the administrative record." (Guidelines, § 15088.5, subd. (e); *Laurel Heights Improvement Assn. v. Regents of Univ. of Cal*. (1993) 6 Cal.4th 1112, 1132-1133.)

## B.

### *Scope of the Project*

Underlying the assertion the draft EIR misrepresented "future development" is High Sierra's assumption the general plan update policies "explicitly create a new model for clustered residential subdivisions *outside of Planning Areas* on resource production lands throughout the County." Based on its assumption of "the [general plan update's] authorization to allow development on hundreds of thousands of acres of resource lands outside the Planning Areas," High Sierra argues the EIR must be recirculated to allow public comment on the rural sprawl invited by the general plan update. As we have explained, however, High Sierra's expectation of unmitigated rural sprawl is not supported by the County's history or the data presented in the EIR. Consequently, the draft EIR did not misrepresent the scope of the project as limiting the vast bulk of future development to that within the planning areas.

We are not persuaded by High Sierra's assertion that the County changed maps in the final EIR without previously disclosing the new information. The record supports the trial court's finding that "[c]ertain maps showing outside Planning Areas were not included until the [final EIR]," but that "throughout the [general plan update]/EIR

29

process, everyone had access to other maps with land use designations for the entire County."

More importantly, the scope of the project did not change between the draft and the final EIRs in a manner that requires recirculation. Notably, the draft EIR disclosed the nature and scope of development inside and outside the planning areas with specific numbers. The draft EIR lists the "[a]llocation of future Plumas County dwelling units and population growth by geographic and planning area." Specific numbers of primary and secondary homes are listed for inside and outside the planning areas of Almanor, Indian Valley, and Mohawk Valley. Thus, while the draft EIR notes that "[i]mplementation of the proposed project would result in the development of new urban uses and infrastructure within the various Planning Areas of the County," the EIR expressly acknowledges that "[a]dditional development would occur on individual lots, but on a more limited basis outside the various Planning Areas."

## C.

### *Building Intensity Standards*

High Sierra asserts the draft EIR did not contain building intensity standards "for all but two land use designations." On this basis, High Sierra argues the incomplete disclosure of building intensity standards in the draft EIR requires recirculation because the public did not have an opportunity to understand and comment on this issue before the County issued its final EIR. We conclude recirculation is not necessary.

The draft general plan update addressed, in Table 1.3, the various "land use designations and permissible densities" for various land uses such as single family residential, suburban residential, rural residential, limited access rural residential. Contrary to High Sierra's characterization of Table 1.3, it did list maximum densities of dwellings per parcel for every identified land use and gave additional details that clarified

30

the maximums for each category of land use. Where High Sierra faults the draft general plan update is that it lists maximum land coverage for only two land use categories: single family residential and multiple family residential.

In response to the draft EIR, High Sierra commented "that the General Plan Update lacks building intensity standards." The County responded that "[b]uilding intensity standards have also been defined for a variety of open space uses. These details are incorporated into Table 1.3 'Land Use Designations and Permissible Densities' of the Goals and Policies Report (beginning on page 42). Population and housing build-out assumptions (see Tables 3-5, 3-6, and 3-9 in Chapter 3 'Project Description' of the Draft EIR) developed for the Draft EIR analysis were based on land use acreages referenced in the correct land use maps and no further changes are necessary to the Draft EIR."

The final general plan update and EIR thus included maximum land use coverages for all remaining categories. This modification was submitted to the Board on December 17, 2013, after the close of the public hearing period for the general plan update. For residences, the modification added a 35-foot maximum height restriction. For rural residential and limited access rural residential categories, a one-acre maximum coverage restriction was imposed. And, for limited access rural residential, the modification noted compatible uses and noted that "[e]xamples are animal husbandry, horticulture and nurseries, wildlife management, hunting clubs, kennels and veterinary services."

The modifications imposed only new restrictions on land use; no restrictions disclosed in the draft general plan update were lessened. Nonetheless, High Sierra reads the new restrictions as "permitting the construction of buildings overlying *up to two acres of land . . .* on literally *thousands of parcels* covering a wide range of [general plan update] land use designations from suburban residential to rural residential to agriculture

31

to timber."  In other words, High Sierra views the new *restrictions* as an unmitigated *invitation* for large-scale development of two-acre structures throughout the County.  We disagree.

First, individual structures cannot exceed one acre.  Second, the County's experience was that only 55 building permits were issued for dwelling units outside of the planning areas for the decade between 2000 and 2010.  During that same 10-year period, only 88 new parcels were created outside the planning areas.  The County further found that "most of the above-referenced 88 parcels (including maps) approved in the last decade could not be approved under the proposed General Plan Update . . . ."  And, third, the County found no evidence there would be a new demand for construction outside of the planning areas.

We are not persuaded the restrictions on maximum size in the revised building intensity standards constituted "significant new information" that rendered the draft EIR "so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comments were precluded."  To the contrary, the addition of maximum sizes for various structures did not change the scope of the project in a rural county for which the data shows fewer parcels and structures will be developed than even the small number over the decade from 2000 to 2010.  "Recirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications to an adequate EIR."  (Guidelines, § 15088.5, subd. (b).)  The draft EIR did not fail as an informational document and the County's final EIR does not need to be recirculated.  Under Guidelines section 15088.5, subdivision (a), the addition of the maximum sizes of structures did not constitute significant new information for this first-tier environmental review.

## DISPOSITION

The judgment is affirmed. The County of Plumas shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

                                        /s/
                                    HOCH, J.


We concur:


        /s/
BLEASE, Acting P. J.


        /s/
MURRAY, J.

33

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----


| | |
|---|---|
| HIGH SIERRA RURAL ALLIANCE, | |
| Plaintiff and Appellant, | C082315 |
| v. | (Super. Ct. No. CV1400009) |
| COUNTY OF PLUMAS, | ORDER GRANTING REQUESTS TO PUBLISH OPINION |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Plumas County, Stephen E. Benson, Judge. Affirmed.

Law Offices of Michael W. Graf and Michael W. Graf for Plaintiff and Appellant.

REMY MOOSE MANLEY, JAMES G. MOOSE, L. ELIZABETH SARINE; and R. CRAIG SETTLEMIRE, Plumas County Counsel, for Defendant and Respondent.

Stoel Rives and Gregory Charles Gatto for Plumas/Sierra Chapter of the Citizens' Alliance for Property Rights, Forest Land Owners of California, Central Coast Forest Association, and Humboldt Coalition for Property Rights as Amici Curiae on behalf of Defendant and Respondent.


BY THE COURT:

The opinion in the above-entitled matter filed on October 19, 2018 was not certified for publication in the Official Reports. For good cause it now appears the

opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.


| /s/ |
| --- |
| MURRAY, Acting P. J. |


| /s/ |
| --- |
| HOCH, J. |