Filed 9/18/23  Sherlock v. Austin CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| AMY SHERLOCK, as Guardian ad litem, etc. et al.,<br><br>        Plaintiffs and Appellants,<br><br>        v.<br><br>GINA AUSTIN et al.,<br><br>        Defendants and Respondents. | D081109<br><br><br>(Super. Ct. No. 37-2021-00050889-CU-AT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, James A. Mangione, Judge.  Affirmed.

Law Office of Andrew Flores and Andrew Flores, in pro. per., and for Plaintiffs and Appellants.

Pettit Kohn Ingrassia Lutz & Dolin, Douglas A. Pettit, Kayla R. Sealey, and Annie F. Fraser for Defendants and Respondents.


Amy Sherlock, her minor children T.S. and S.S., and Andrew Flores (collectively, plaintiffs) brought a civil lawsuit against Gina Austin and her law firm, the Austin Legal Group (collectively, Austin), as well as a litany of

other individuals who are involved with operating and advising cannabis businesses in San Diego, alleging a wide-ranging conspiracy to monopolize the cannabis market. In response, Austin brought a special motion to strike under Code of Civil Procedure section 425.16[1], asserting the plaintiffs' claims against Austin arose from petitioning activity and that the plaintiffs could not show a probability of prevailing on the merits of those claims. The trial court agreed with Austin and granted the motion.

The plaintiffs appeal the judgment that was entered in favor of Austin shortly after the court's order granting her motion to strike. They argue Austin assisted her clients in filing false documents to obtain cannabis business licenses and helped them evade tax obligations, and that this illegal conduct is unprotected by the anti-SLAPP statute. In response, Austin asserts that the allegations in the complaint that are at issue relate solely to her role of assisting her clients in obtaining Conditional Use Permits (CUPs). She contends this conduct is petitioning activity that is protected and that the plaintiffs' assertions of illegal activity are based only on conclusory allegations that are unsupported by any facts in the record.

As we shall explain, we agree with Austin that the plaintiffs have not demonstrated the court erred by granting her anti-SLAPP motion and subsequently entering judgment in her favor. Accordingly, the judgment is affirmed.

---

[1] Code of Civil Procedure section 425.16 is commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.) Subsequent undesignated statutory references are to the Code of Civil Procedure.

FACTUAL AND PROCEDURAL BACKROUND[2]

A. *Plaintiffs' Complaint*

Andrew Flores, who represents the plaintiffs in this action, filed the First Amended Complaint (FAC) in San Diego Superior Court on behalf of himself, Sherlock, and Sherlock's two minor children.[3] The FAC alleges a conspiracy to monopolize the marijuana market in San Diego in violation of the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.), as well as claims for conversion, civil conspiracy, declaratory relief, and unfair competition and unlawful business practices (*id.*, § 17200 et seq.).

Three claims are asserted against Austin—violation of the Cartwright Act, unfair competition and unlawful business practices, and civil conspiracy. The FAC focuses on the acquisition of, and in one case application for CUPs related to four properties: (1) 1210 Olive Street, Ramona, CA 92065 (the Ramona property), (2) 8863 Balboa Avenue, Unit E, San Diego, California 92123 (the Balboa property), (3) 6176 Federal Blvd., San Diego, CA 92114 (the Federal property), and (4) 6859 Federal Blvd., Lemon Grove, CA 91945

---

[2] Because we are reviewing the record on the court's ruling on Austin's anti-SLAPP motion, we take the factual background from the allegations of the operative complaint, as well as from evidence presented to the court for purposes of the anti-SLAPP motion.

[3] The FAC was not included in the appellate record. However, the plaintiffs ask this court to take judicial notice of the FAC, as well as three additional documents: this court's opinion in *Razuki v. Malan* (Feb. 24, 2021, D075028 [nonpub. opn.], arising from San Diego Superior Court Case No. 37-2018-00034229-CU-BC-CTL (*Razuki II*)); a declaration Austin submitted in the trial court in *Razuki II*; and a trial transcript from *Geraci v. Cotton*, San Diego Superior Court Case No. 37-2017-00010073-CU-BC-CTL. On our own motion, the record is augmented to include the FAC. (Cal. Rules of Court, rule 8.155(a)(1).) We grant the request for judicial notice of Austin's declaration in *Razuki II* and otherwise deny the request.

3

(the Lemon Grove property). The thrust of the complaint, as it relates to Austin, is that she and the other defendants engaged in anticompetitive conduct by submitting CUP applications to regulators that failed to disclose the real owners of the marijuana dispensary operations, in violation of the law.

The FAC alleges that after the passing of Sherlock's husband Michael in 2016, Sherlock was defrauded by Michael's business partners, Stephen Lake and Bradford Harcourt, in their incipient medical marijuana business. According to the FAC, Michael was granted the CUPs for the Ramona and Balboa properties. The plaintiffs allege that after Michael's death, Lake and Harcourt falsely told Sherlock that her husband's estate had no interest in the business and forged Michael's signature on documents to dissolve a limited liability company, LERE, that Michael, Harcourt, and Lake had established to hold real property for the business.

According to the FAC, at some point after Michael's death, the CUP for the Ramona property was transferred to Harcourt, Lake, Eulenthias Duane Alexander, and Renny Bowden. Harcourt allegedly transferred the CUP for the Balboa property from Michael's holding entity to his own holding entity, San Diego Patients Cooperate Corporation, Inc. (SDPCC). The Balboa property itself, which had been owned by LERE, was transferred to a limited liability company (LLC) owned by Lake called High Sierra Equity, then to an LLC owned by Salam Razuki called Razuki Investments, and finally to an LLC owned by Ninus Malan called San Diego United Holdings Group.

Much of the FAC focuses on the conduct of Razuki and Malan, and Larry Geraci, who was represented by Austin in his efforts to obtain CUPs for marijuana operations. According to the FAC, Harcourt and Lake transferred the Balboa property to Razuki based on a proposed joint venture agreement

4

to operate a dispensary at the property. The plaintiffs allege that after this transfer, Razuki and Malan falsely represented to the City of San Diego that they were also owners of the CUP for the property. Harcourt and SDPCC sued Razuki alleging he had defrauded them of the CUP for the Balboa property (*San Diego Patients Cooperative Corporation, Inc. v. Razuki Investments, LLC*, San Diego Superior Court Case No. 37-2017-00020661-CU-CO-CTL (*Razuki I*)).

The FAC further alleges that Razuki sued Malan over their partnership, *Razuki II*, and that Razuki was later arrested for attempted murder after he hired an FBI informant to kill Malan. The FAC asserts that in *Razuki II*, Razuki admitted he and Malan agreed that Malan would hold title to cannabis assets without disclosing Razuki's ownership because his prior involvement in unlicensed commercial cannabis activities disqualified him from obtaining a CUP. According to the FAC, in *Razuki II*, the court appointed a receiver to manage the assets in dispute and approved the sale of the Balboa property and its CUP to an entity called Prodigious Collective. The plaintiffs allege Prodigious Collective then transferred ownership of those assets to Allied Spectrum, Inc.[4]

The allegations concerning Geraci primarily center on the Federal property. The FAC states that "when Flores became the equitable owner of the Federal Property, he began investigating Geraci" and uncovered "the relationships between Geraci, Magagna, Razuki, Malan and Dave Gash via Austin, who has represented all parties." The plaintiffs allege that in 2016,

_____

[4]    The FAC also asserts that Flores obtained information from an investigative journalist who was told by an employee of Razuki that Austin obtained "confidential information" about real property that qualified for CUPs from her clients who were not members of the conspiracy. Austin then allegedly provided that information to Razuki in order to assist him in acquiring property.

5

Geraci identified a property located at 6176 Federal Blvd. as a potential location for a medical marijuana dispensary and began negotiations with the property's owner, Darryl Cotton, to purchase it.

The FAC alleges that Geraci hired Austin, James Bartell (described in the FAC as a political lobbyist), and Abhay Schweitzer (other documents in the record reveal Schweitzer is an architect) to represent him in his application to obtain a CUP for the Federal property from the City of San Diego. The FAC alleges that, like Razuki, Geraci intentionally failed to use his own name in the application because prior unlicensed cannabis activity disqualified him from participating in the business. Specifically, the plaintiffs assert that Geraci, Austin, Bartell, and Schweitzer prepared the CUP application in the name of Geraci's assistant, Rebecca Berry, falsely representing that Berry would be the owner of the CUP, and obscuring Geraci's and Cotton's ownership.

The FAC alleges Cotton and Geraci reached an agreement on November 2, 2016 for the sale of Cotton's property and proposed marijuana operations, and that Austin was tasked with preparing a final written agreement for execution. However, because a final agreement was not prepared, Cotton entered into an alternate agreement to sell the property and his interest in the pending CUP application with a third party in the event that the deal with Geraci was not finalized.[5] This, in turn, prompted Geraci to file suit against Cotton seeking to enforce Cotton's oral agreement to enter into a joint venture agreement with Geraci for the sale of the property and

---

[5] The FAC alleges that before this agreement, Cotton approached Christopher Williams as a partner for the CUP, but that Williams was told by Austin, who was his attorney, that Cotton already had a final agreement with Geraci for the Federal property, causing Williams to withdraw from the negotiations. The FAC states that Williams was a plaintiff in this action, but withdrew from the suit.

6

the CUP, with Cotton to receive a portion of the proposed marijuana operations profit on a monthly basis. (*Geraci v. Cotton*, San Diego Superior Court Case No. 37-2017-00010073-CU-BC-CTL.) Cotton then counter-sued, initially as a pro se litigant, alleging various causes of action, including that Geraci and Berry had conspired to hide Geraci's ownership interest because he had been sued by the City of San Diego for operating and managing unlicensed, unlawful, and illegal marijuana dispensaries that "would ruin Geraci's ability to obtain a CUP himself."

The plaintiffs allege that Cotton then obtained a litigation investor, "Hurtado," who initially retained Jessica McElfresh, who had previously "represented Geraci, Razuki, and Malan in various legal matters" related to cannabis operations. McElfresh then backed out of the representation, and Hurtado hired two attorneys with the law firm of Finch, Thorton, and Baird (FTB) to represent Cotton. The FAC alleges FTB, named as a defendant, then worked to sabotage Cotton's case. According to the plaintiffs, FTB filed an amended cross-complaint removing Cotton's allegation that Geraci was unable to obtain a CUP. Further, they allege FTB failed to vigorously defend Cotton against Geraci's demurrer to Cotton's cross claims and assert FTB was loyal to Geraci because it shared clients with Geraci's tax business. The FAC also alleges that FTB wanted Cotton to sign a declaration stating he, and not Geraci, was pursuing the CUP for the property. As a result of these tactics, Cotton fired FTB.

The FAC alleges that Austin testified at the bench trial in *Geraci v. Cotton* that she was not aware of two judgments that had previously been entered against Geraci for illegal marijuana operations, that she did not remember why Geraci used Berry as the applicant for the CUP on Cotton's property, and that she did not know why he was not listed on the ownership

7

disclosure statement for the application.[6]  According to the FAC, the judge in *Geraci v. Cotton* ruled against Cotton, finding he had unlawfully interfered with the CUP application for the property and that Geraci was not barred by law from owning a CUP, and that the court also awarded Geraci damages.

The FAC alleges that in March 2018, Aaron Magagna submitted a CUP application for a property located at 6220 Federal Blvd., within 1000 feet of the Federal property.  According to the FAC, that CUP was approved by the City of San Diego in October 2018.  The plaintiffs assert this application was submitted to prevent the approval of the CUP for the Federal property that was submitted in Berry's name in order to limit Geraci's liability for the false information contained in that application.

The FAC alleges that prior to this CUP approval and the judgment in the litigation between Cotton and Geraci, Alexander and Logan Stellmacher visited Cotton and offered to purchase the Federal property.  When Cotton refused the offer, they attempted to coerce him to settle the litigation with Geraci and then threatened they had the "ability to have the San Diego Police Department raid the Federal Property and have Cotton arrested on fabricated charges and planted drugs."  They also threatened to "have dangerous individuals visit the Federal Property implying they would cause bodily harm to Cotton."

The FAC also alleges that another potential investor in the Federal property and in Cotton's suit against Geraci, "Young," was told by her lawyer not to invest because the Berry CUP application would be denied.[7]  Young was allegedly also told in a meeting with Cotton that he believed Magagna

---

[6]    The FAC also alleges that Austin attempted to avoid service of process of a petition for writ of mandate filed by Cotton in his case against Geraci.

[7]    The FAC asserts that Young and Austin went to law school together and were admitted to the bar the same year.

was a co-conspirator of Geraci who was working to have the competing CUP application approved. According to the FAC, Young asked Magagna if this was true and he did not deny the allegation. The FAC alleges when Cotton attempted to depose Young, her counsel prevented the deposition and then Young moved to Palm Springs after being offered a job at a dispensary there, whose owners were also clients of Austin.

Another set of allegations concern Shawn Joseph Miller, who the plaintiffs assert is another associate of Geraci. The FAC alleges Miller has a criminal background and threatened Hurtado to try to coerce Cotton to settle his litigation with Geraci. With respect to the Lemon Grove property, the FAC alleges that Williams retained Austin to be his attorney for "cannabis related matters," but that Austin dissuaded Williams from pursuing the property by falsely representing it would not qualify for a CUP. According to the FAC, a CUP was awarded for the property thereafter.

B. *Motion to Strike*

In response to the complaint, Austin filed an anti-SLAPP motion. Therein, she asserted that the three claims against her in the FAC were premised entirely on the protected conduct of petitioning the local land use authority for CUPs on behalf of her clients. Further, the motion asserted that the plaintiffs could not show a probability of prevailing on the claims because they are barred by Civil Code section 1714.10 and the litigation privilege. In addition, the motion asserted the Cartwright Act violation was not viable because the plaintiffs failed to plead facts showing the defendants had agreed to restrain trade.

With respect to the claims under Business and Professions Code section 17200 et seq., Austin asserted the plaintiffs could not show a probability of prevailing as to her because the claims were premised on an

9

alleged violation of Business and Professions Code section 26057. That provision sets forth criteria for cannabis licensing agencies to consider, but does not require those authorities to deny a license based on any particular category, including if the applicant had been previously sanctioned for unlicensed commercial cannabis activity. Finally, Austin asserted the plaintiffs could not prevail on their civil conspiracy claim against her because they had not pleaded any facts showing her agreement to join or acts in furtherance of the conspiracy.

In their opposition to the motion, the plaintiffs argued that their claims were viable because Business and Professions Code section 26057 precluded Razuki and Geraci from owning a cannabis business. According to the plaintiffs' interpretation of that statute, the provision required the regulator to deny Geraci and Razuki's CUP applications because they were previously sanctioned for unlicensed medical marijuana operations. The plaintiffs also asserted that the anti-SLAPP statute did not apply to their claims because Austin's petitioning activity, specifically failing to disclose the actual owners of the cannabis operations, is illegal under Penal Code section 115 and likewise exempted from the first amendment protection afforded by the *Noerr-Pennington* doctrine because the petitioning activity was a sham designed to monopolize the industry.

The plaintiffs also argued Austin's conduct was not subject to the pre-filing requirements of Civil Code section 1714.10 because her efforts to secure CUPs for her clients are not an "attempt to contest or compromise a claim or dispute" as required by that statute and because the alleged conduct is illegal. Similarly, the plaintiffs contended the litigation privilege could not be used as a shield for Austin's illegal conduct. Finally, they argued the alleged conduct violated the UCL and the Cartwright Act because it was anti-

10

competitive and unlawful. The plaintiffs did not submit any evidence to support their opposition, instead relying solely on their legal arguments.

In reply, Austin asserted there was no dispute that the alleged conduct was petitioning activity protected under the anti-SLAPP statute. Further, she argued the plaintiffs had failed to meet their burden to show a likelihood of prevailing on their claims because they presented no evidence in support of their assertion that Austin's actions were illegal and failed to otherwise establish how they could satisfy the elements of each cause of action.

At the conclusion of a short hearing on the motion, the court confirmed its tentative ruling finding that the allegations against Austin all involved protected petitioning activity and that the plaintiffs had failed to meet their burden to show a probability of prevailing on the claims. Shortly after, the court entered judgment in favor of Austin.

## DISCUSSION

The plaintiffs argue on appeal, as they did in the trial court, that Austin's conduct, which they describe as "filing applications with State and City cannabis licensing agencies with false and fraudulent information," is illegal as a matter of law and thus not subject to the protections afforded by section 425.16. In addition, the plaintiffs argue that even if the conduct is protected petitioning activity, the trial court erred by finding that evidence was required to meet their burden of showing a probability of prevailing under the anti-SLAPP statute. As we shall explain, these arguments do not support reversal of the judgment in favor of Austin.

## I

### *Legal Standards*

Section 425.16 sets a procedure for striking "lawsuits that are 'brought primarily to chill the valid exercise of the constitutional rights of freedom of

11

speech and petition for the redress of grievances.' " (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 197.) Under section 425.16, the "trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) Section 425.16 provides in pertinent part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

Resolution of an anti-SLAPP motion "thus involves two steps. 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819–820.) " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' " (*Id.* at p. 820.)

"A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' (*Equilon* [*Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53,] 66), and that the plaintiff's claims in fact *arise* from that conduct (*Park v. Board of*

12

*Trustees of California State University* (2017) 2 Cal.5th 1057, 1063).” (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620.) Subdivision (e) provides that an “ ‘act in furtherance of a person’s right of petition or free speech under the United States or California Constitution in connection with a public issue’ includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.” (§ 425.16, subd. (e).)

“A defendant’s burden on the first prong is not an onerous one. A defendant need only make a prima facie showing that plaintiff’s claims arise from the defendant’s constitutionally protected free speech or petition rights. (See *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456.) ‘ “The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish [his or] her actions are constitutionally protected under the First Amendment as a matter of law.” [Citation.] “Instead, under the statutory scheme, a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case,

13

resulting in an improper shifting of the burdens." ' " (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 112, italics omitted.) However, if "the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petitioning activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 320 (*Flatley*).)

For purposes of both prongs of an anti-SLAPP motion, "[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff …." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) With respect to the second prong, "in order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citations.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] [Like the trial court, we] consider 'the pleadings, and supporting and opposing affidavits ... upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).)" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) Our de novo review "includes whether the anti-SLAPP statute applies to the challenged claim." (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645.) "[W]e apply our independent judgment to determine whether" the claim arises from acts done in

14

furtherance of the defendants' "right of petition or free speech in connection with a public issue." (*Ibid.*) "Assuming these two conditions are satisfied, we must then independently determine, from our review of the record as a whole, whether [the plaintiffs have] established a reasonable probability that [they will] prevail on [their] claims." (*Ibid.*)

## II

### *Analysis*

### A

### *First Prong of the Anti-SLAPP Analysis*

The plaintiffs do not challenge the trial court's finding that their allegations against Austin concern protected petitioning activity. Rather, they argue that the anti-SLAPP statute does not apply to Austin's conduct because the activity, which they describe as "filing applications with State and City cannabis licensing agencies with false and fraudulent information," is illegal as a matter of law. They make their argument in three parts.

First, they assert that the alleged conduct is illegal because the CUP applications prepared by Austin contained false information, in violation of Penal Code sections 115 and 118. Next, the plaintiffs contend, without making any connection to Austin, that Razuki and Malan's cannabis operations are illegal as a matter of law because those defendants evaded their tax obligations. Finally, the plaintiffs assert that Austin's conduct was illegal because Business and Professions Code section 26057 strictly precludes regulators from granting CUPs to applicants who have been sanctioned in the prior three years for engaging in "unauthorized commercial cannabis activities." (Bus. & Prof. Code, § 26057, subd. (a).) None of these arguments support reversal of the judgment entered in favor of Austin.

15

As an initial matter, as Austin points out in her brief, the plaintiffs make two new arguments that were not presented in the trial court. They assert for the first time on appeal that Austin's conduct was not protected by the anti-SLAPP statute because it violated Penal Code section 118 and because Razuki and Malan evaded their tax obligations. "Failure to raise specific challenges in the trial court forfeits the claim[s] on appeal. ' " '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. ... "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider." ' " (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564.) Because these arguments were not presented in the trial court, we decline to consider them for the first time here.

The plaintiffs have also not established that the trial court erred by finding that Austin's conduct was unprotected by the anti-SLAPP statute because it was illegal, as a matter of law, under either Penal Code section 115 or Business and Professions Code section 26057. Penal Code section 115 states, "[e]very person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." If Austin (or her law firm) had conceded that she submitted false documentation to the regulatory authorities or some evidence in the record conclusively established such conduct, we might agree with plaintiffs that

16

Austin's alleged conduct fell outside the protection of section 425.16. (See *Flatley, supra*, 39 Cal.4th at p. 320.)

However, no such concession or conclusive evidence exists in this case. In her unrebutted declaration in support of the anti-SLAPP motion, Austin states that she was not involved in the CUP applications for the Ramona or the Lemon Grove properties and that the application she prepared for the Federal property was abandoned when the CUP for the neighboring property was granted. Further, she states that her involvement in the CUP application for the Balboa Property was limited to helping Michael Sherlock's attorney with the initial application.

In response to this evidence, the plaintiffs point to one statement by Austin in a declaration submitted in *Razuki II*, which was not submitted in the trial court in this case. In the declaration, Austin states that "[t]he Bureau of Cannabis Control ("BCC") requires all owners[, as the term is defined by regulation,] to submit detailed information to the BCC as part of the licensing process." The plaintiffs contend this statement shows Austin knew that she was required to disclose Geraci's and Razuki's ownership interests, and that she knowingly failed to do so.

Even if this evidence had been before the trial court, it does not show Austin knowingly filed a false CUP application for the Federal property (or any other property); indeed, the plaintiffs do not describe Austin's role in the applications at all, instead making only a bare accusation that she submitted false information. Austin's declaration in the *Razuki II* case establishes only that Austin was aware of regulatory disclosure requirements. It does not show that her involvement in the various CUP applications constituted unlawful conduct that falls outside of anti-SLAPP protection. (See *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 399 ["Bare allegations of aiding and

17

abetting or conspiracy do not suffice to remove these acts from the protection of the statute."] (*Contreras*).)  Further, the plaintiffs provided no evidentiary support to counter Austin's statement that she had no involvement in the CUP applications for the Ramona property or the Lemon Grove property and that her only involvement in the Balboa property CUP application was to assist Michael Sherlock.  In sum, the plaintiffs have not shown any conduct that was illegal as a matter of law under Penal Code section 115.

Plaintiffs' argument that the alleged conduct is illegal as a matter of law because it violates Business and Professions Code section 26057 is also not persuasive.  They contend the statute flatly precludes regulators from issuing a license to someone who has previously engaged in unlawful commercial cannabis activity, and that Razuki and Geraci have both run afoul of this rule.  The statute, however, gives the regulator discretion to deny licensure.  It does not mandate denial.  The provision, which was initially adopted by the electorate in 2016 under Proposition 64, is part of "a comprehensive regulatory structure in which every marijuana business is overseen by a specialized agency with relevant expertise."  (Control, Regulate and Tax Adult Use of Marijuana Act, 2016 Cal. Legis. Serv. Prop. 64.)

The law requires state licensure of all marijuana businesses by the State's Department of Cannabis Control.  To this end, subdivision (a) of Business and Professions Code section 26057 states that the department "shall deny an application if either the applicant, or the premises for which a state license is applied, do not qualify for licensure under this division." Subdivision (b), in turn, states that "[t]he department may deny the application for licensure or renewal of a state license if any of the following conditions apply," and lists ten conditions that can form a basis for the denial.  Relevant here, subdivision (b)(7) allows for denial of a license if "[t]he

18

applicant, or any of its officers, directors, or owners, has been sanctioned by the department, the Bureau of Cannabis Control, the Department of Food and Agriculture, or the State Department of Public Health or a city, county, or city and county for unauthorized commercial cannabis activities, has had a license suspended or revoked under this division in the three years immediately preceding the date the application is filed with the department."

The plaintiffs argue that subdivision (a) of Business and Professions Code section 26057 mandates the denial of a license if one of the conditions set forth in subdivision (b) of the statute exists. However, the plain language of the statutes does not support this interpretation. Rather, the provision the conditions are found in, subdivision (b), states clearly that the existence of one of the listed conditions "may" support denial of an application for licensure. Thus, denial is permissive, not mandatory. Further, even if the statute required the state agency to deny licensure, the plaintiffs have not explained how this would make *Austin's conduct* (i.e. assisting with a CUP application that was never granted) illegal as a matter of law.

Accordingly, these arguments do not support reversal of the trial court's finding that Austin's conduct falls within the protection afforded by the anti-SLAPP statute.

B

*Second Prong of the Anti-SLAPP Analysis*

The plaintiffs also argue that the trial court erred by "finding that [they] presented no evidence" that Austin and her firm filed CUP applications without disclosing the actual owners of the property, conduct they call the "Strawman Practice." Specifically, they assert that "Austin did not dispute and admitted that ALG undertakes the Strawman Practice" and therefore no evidence was required to support this fact. In addition, they repeat their

19

argument that Austin's alleged conduct was illegal as a matter of law and, quoting *Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d 141 (*Lewis*), assert the trial court had a " 'duty to ascertain the true facts' " regardless of their evidentiary submissions.

The plaintiffs' contention that Austin admitted she acted illegally is not supported by the record before this court. As Austin points out in her briefing, the plaintiffs do not provide any citation to the record to support their assertion that she conceded any illegal conduct. It is the plaintiff's burden to show a probability of prevailing on the merits of their claims once the defendant has shown the alleged conduct is protected by the anti-SLAPP statute. Because the plaintiffs have provided no support for their assertion that Austin conceded the illegality of her conduct, we have no basis to reverse the trial court's judgment on this ground. (See *Hill v. Affirmed Housing Group* (2014) 226 Cal.App.4th 1192, 1200 [argument on appeal deemed abandoned by failure to present relevant factual analysis and legal authority].)

The plaintiffs additional arguments related to the second prong of the anti-SLAPP analysis also do not provide a basis for reversal. As discussed in the preceding section, the plaintiffs have not shown Austin's alleged conduct is illegal as a matter of law. And their argument that the trial court had an independent duty to ascertain the truth of the allege conduct misstates the law. The anti-SLAPP statute places the burden on the plaintiffs to show a probability of prevailing on the merits of their claims. (See *Contreras, supra,* 5 Cal.App.5th at p. 405 [" ' "[T]he plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " ' "].) This procedure is not akin to the analysis at

issue in *Lewis*, which involved a plaintiff subcontractor attempting to enforce an illegal contract it made with the defendant. (*Lewis, supra*, 48 Cal.2d at pp. 147–148.)

In *Lewis*, the California Supreme Court rejected the plaintiff's argument that the defendant's admission in its answer that plaintiff had furnished certain equipment under the contract prevented the trial court from reaching the issue of the contract's illegality. (*Lewis, supra*, 48 Cal.2d at pp. 147–148.) In its holding, the court stated, "[w]hatever the state of the pleadings, when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids." (*Ibid.*) Contrary to the plaintiffs' argument, this statement concerning the illegality of a contract has no bearing on whether the plaintiffs here met their burden on the second step of the anti-SLAPP analysis.[8]

The plaintiffs have failed to show the trial court erred in finding they had not met their burden to show a probability of prevailing on their claims against Austin.

---

[8] The plaintiffs' reply brief contains several new arguments, including an assertion that Austin's contracts with her clients are illegal and unenforceable under *Lewis* and similar cases. This argument, and the plaintiffs' other new contentions, are not tethered to the anti-SLAPP analysis at issue and consist of unsupported assertions of wrongdoing. These arguments are forfeited and our discussion of the issues is limited accordingly. (See *High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2 ["New arguments may not be raised for the first time in an appellant's reply brief."].)

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs of appeal.

McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


CASTILLO, J.