Filed 11/17/25  Marriage of Sopwith CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re the Marriage of LAURIE and JAMES SOPWITH. | C096420 |
| LAURIE B. SOPWITH, <br><br> Appellant, <br><br> v. <br><br> JAMES T. SOPWITH, <br><br> Appellant. | (Super. Ct. No. 19FL01752) |

James T. Sopwith (Jim) and Laurie B. Sopwith (Laurie) appeal and cross-appeal from the judgment in their exhaustively litigated marital dissolution proceeding.[1]  Jim and Laurie each established farming operations prior to marriage.  Jim's farming

---

[1] We follow the parties' lead in referring to them by the shortened versions of their first names.

1

operation, known as Sopwith Farms, increased significantly in value over the life of the marriage. Laurie's farming operation, known as LBS, also increased in value, though not nearly as much.

Jim primarily argues the trial court should have ordered Laurie to make an equalization payment for his community interest in LBS. He also argues: (1) the trial court should have ordered Laurie to reimburse Sopwith Farms for amounts paid towards her attorney's fees and costs; (2) the trial court should have sanctioned Laurie for breaches of fiduciary duty pursuant to Family Code sections 721 and 1101;[2] and (3) the trial court should have sanctioned Laurie's trial counsel. We will reject all of Jim's arguments.

Laurie's cross-appeal emphasizes differences in the trial court's tentative and final statements of decision. The trial court's tentative statement of decision indicated Laurie was entitled to an award of $1 million for her community interest in Sopwith Farms. That award was based on a computational error, which neither party disputes. The trial court corrected the error in the final statement of decision, thereby nullifying the $1 million award. Laurie argues the correction should have prompted the trial court to reconsider other findings in the final statement of decision, including those underlying the denial of her request for an additional award of need-based attorney's fees and the rate of return applied to Jim's capital contributions from separate property to Sopwith Farms. Laurie's arguments fare no better than Jim's. Accordingly, we will affirm the judgment.

## I. BACKGROUND

Laurie and Jim met in 1988. She was an associate attorney at the Sacramento office of a national law firm; he was a farmer from a Sacramento-area farming family.

---

[2] Undesignated statutory references are to the Family Code.

Laurie and Jim married in 1991 and separated in 2019. They have two sons, both now adults.

Laurie petitioned for dissolution of the marriage in 2019, seeking attorney's fees, spousal support, and a determination of property rights. A lengthy marital dissolution trial was conducted over 20 days in March and April 2021. The trial court issued a tentative statement of decision on December 22, 2021, to which both sides objected. The trial court issued a final statement of decision on March 25, 2022. We summarize the relevant evidence and the trial court's tentative and final statements of decision below.

A. *Sopwith Farms*

Jim established Sopwith Farms with his father in 1975. Sopwith Farms grows rice on leased land, leases farming equipment, and provides farming services to other farms. By 1994, Jim had become the sole owner of Sopwith Farms through inheritance. The business prospered over the years, growing in value from $429,970 at the time of the marriage to $4,757,715 as of December 31, 2020 (a stipulated date for the purpose of trial).

Characterization of Sopwith Farms was a key issue at trial. Jim argued Sopwith Farms was his separate property; Laurie argued Sopwith Farms and LBS, together with other farming entities, constituted "one farm," which was collectively community property. The trial court determined that Sopwith Farms was Jim's separate property, but community efforts contributed to its increase in value. That determination led to dueling opinions as to how the increase in value should be apportioned. (See generally *In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472 ["When a spouse's personal efforts increase the value of his or her separate property business, 'it becomes necessary to quantify the contributions of the separate capital and community effort to the increase,' because the 'community is entitled to the increase in profits attributable to [the] community endeavor' "].)

3

Trial courts typically apply one of two approaches to apportioning the increased value of separate property. (*In re Marriage of Brandes, supra*, 239 Cal.App.4th at pp. 1472-1473.) The first approach, named for *Pereira v. Pereira* (1909) 156 Cal.1, 7 (*Pereira*), applies "where business profits are principally attributed to the efforts of the community." (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 853 (*Dekker*).) Courts applying the *Pereira* approach "allocate a fair return to the separate property investment and allocate the balance of the increased value to community property as arising from community efforts." (*Id.* at pp. 852-853.) As noted, Laurie primarily argued that Sopwith Farms and LBS were "one farm," which was community property. However, she also argued that the trial court should apply the *Pereira* approach to determine any community interest in Sopwith Farms.

Jim argued against the *Pereira* approach. He urged the trial court to apply the second approach to equitable apportionment, named for *Van Camp v. Van Camp* (1921) 53 Cal.App.17, 27-28 (*Van Camp*). Trial courts apply the *Van Camp* approach "where community effort is more than minimally involved in a separate business, yet the business profits accrued are attributed to the character of the separate asset." (*Dekker, supra*, 17 Cal.App.4th at p. 853.) Courts applying the *Van Camp* approach "determine the reasonable value of the community's services, allocate that amount to community property and the balance to separate property." (*Ibid.*) Again, Jim argued against the *Pereria* approach and for the *Van Camp* approach.

The trial court selected the *Pereira* approach.[3] Applying *Pereira,* the trial court found the value of Sopwith Farms was $429,970 at the date of marriage and $4,757,715 as of December 31, 2020, and thus enjoyed an increase in value of $4,327,745. The trial

---

[3] Neither party challenges that choice on appeal. (See *Dekker, supra*, 17 Cal.App.4th at p. 853 ["The court has discretion to choose whichever formula will effect substantial justice"].)

court further found that Jim made capital contributions to Sopwith Farms from his separate property in the amount of $1,158,973, resulting in an overall separate property investment of $1,588,943.[4]  The trial court apportioned Jim's capital contributions to Sopwith Farms to separate property, with a return of seven percent compound interest from the date of marriage, for a total separate property interest of $6,777,622.  It was on this calculation that the computational error occurred.

In the tentative statement of decision, the trial court subtracted the value of Sopwith Farms as of December 31, 2020 ($4,757,715) from Jim's total separate property interest ($6,777,622) and apportioned the balance ($2,019,907) to the community.[5]  The trial court then determined that Jim and Laurie were each entitled to 50 percent of that amount, or $1,009,953 per spouse.  Everyone agrees the trial court's tentative calculation and conclusion were wrong.

What the trial court should have done was subtract Jim's separate property interest in Sopwith Farms ($6,777,622) from its value as of December 31, 2020 ($4,757,715), resulting in a negative number (- $2,019,907), and a finding of no community interest.[6]  Again, this much is undisputed.  It is what happened next that forms the basis for Laurie's cross-appeal.

The trial court corrected the computational error in the final statement of decision, noting, "even though substantial community efforts contributed to the increased value of Sopwith Farms, no community interest exists at this time."  In a footnote, the trial court elaborated:  "The Court regrets the computation error in [the tentative statement of decision].  While the difference between the amount attributable to the community in the

---

[4] $1,158,973 + $429,970 = $1,588,943.

[5]  $6,777,622 - $4,757,715 = $2,019,907.

[6]  $4,757,715 - $6,777,622 = - $2,019,907.

[tentative statement of decision] and that attributable [to the community] in this [statement of decision] is monetarily significant, it does not change the Court's application of the *Pereira* formula in this case. Nor does it cause the Court to modify any of its other findings. The Court has thought long and hard about this."

Laurie argues that correcting the error should have prompted the trial court to change other findings in the final statement of decision. Specifically, she argues the elimination of the $1 million award for Laurie's community interest in Sopwith Farms should have prompted the trial court to grant her request for an additional award of need-based attorney's fees and change the *Pereira* return rate from seven percent compound interest to five percent simple interest. We will discuss these arguments in the section of the opinion devoted to Laurie's cross-appeal.

B.     LBS

Laurie started LBS in 1990, after meeting Jim but before marrying him. Now defunct, LBS grew rice on leased land, using materials, equipment, and labor provided by Sopwith Farms. The trial court found that LBS was worth nothing at the time of the marriage, and $595,299 on the stipulated valuation date of December 31, 2020. Neither party disputes these findings on appeal. They instead focus on whether LBS's increase in value should be equitably apportioned. This was not an issue that received much attention at trial.

As previously discussed, Laurie principally argued Sopwith Farms and LBS comprised "one farm," which should be characterized as community property; she argued in the alternative that, to the extent Sopwith Farms and LBS were separate property, any community interest in either of those entities should be valued using the *Pereira* approach. Jim generally argued that Sopwith Farms was his separate property and LBS was Laurie's. He devoted scant attention to the question of how LBS's increase in value should be equitably apportioned, if at all.

6

Jim appears to have discussed equitable apportionment of LBS only once, in his trial brief. He argued for application of the *Van Camp* approach, stating: "Jim does not believe the value of Laurie's community efforts into LBS were significant during marriage. He believes that Laurie paid more in community expenses from LBS than the community services she performed were worth. Therefore, Jim does not believe there is any community interest in LBS. [Citation.] Using a *Van Camp* [analysis], Jim concedes LBS is entirely Laurie's property."

The trial brief went on to discuss the *Pereira* approach, noting: "The *Pereira* apportionment method has the consequence of awarding Jim half the value of LBS." Speaking in the conditional tense, Jim observed: "LBS is currently valued at $595,299, so Jim would receive an equalization [payment] from Laurie for $297,649.50 under a *Pereira* [calculation]." However, the trial brief suggested the *Pereira* approach would be a poor fit, as "LBS had a negative value at marriage." "With a negative value at marriage," the trial brief argued, "there is nothing to give a fair 'rate of return' to during marriage." Perhaps for this reason, the trial brief expressly argued for application of the *Van Camp* approach to apportionment of LBS, but did not directly seek application of the *Pereira* approach. Whatever the reason, Jim soon pivoted to another theory.

Jim's trial brief was followed by a supplemental trial brief filed that same day. The supplemental trial brief explained that exhibits to Jim's previously submitted trial brief were meant to describe two scenarios for LBS. In the first scenario, LBS would be allocated entirely to Laurie. The community interest in LBS and allocation to the community would be zero. In the second, described in an exhibit reflecting a schedule of section 2640 reimbursements, Laurie would reimburse Jim for separate property contributions made by Sopwith Farms to LBS in the amount of $720,000, to be capped at $595,299 (the value of LBS). The supplemental trial brief explained: "This schedule has not been created for the primary purpose of seeking these reimbursements. . . . Jim's formal position has been that all reimbursements between the parties should [be] offset

7

against each other and zeroed out, which would be a benefit to Laurie of $595,299. However, since Laurie has persisted with litigation in the manner she has, substantial justice may warrant awarding them." Jim pressed these positions—and not apportionment of LBS under *Van Camp* or *Pereira*—through trial.

During the trial, Jim argued he was entitled to reimbursement for separate property contributions to LBS pursuant to section 2640. Jim's forensic accountant, Andrew Leith, confirmed that he was taking the position that LBS was Laurie's separate property "without doing any sort of apportionment," subject to Jim's claim for section 2640 reimbursements.[7] Leith did not testify to any community interest in LBS. By contrast, Laurie's forensic accountant, Paul Harms, offered two alternative approaches to valuing LBS. The first approach viewed Sopwith Farms and LBS as "one big family farm," which was community property. The second applied *Pereira* to value the community interest in LBS.

The parties submitted closing briefs in lieu of closing arguments. The briefs were voluminous, spanning more than 500 pages. As relevant here, Jim's 175-page closing brief and 124-page response to Laurie's closing brief each asked that the trial court "find LBS is Laurie's separate property, but that the entire value of the asset be owed to Jim pursuant to [section] 2640." Although Laurie's closing brief argued for apportionment of LBS under the *Pereira* approach (as an alternative to her primary theory that LBS and Sopwith Farms were "one farm"), neither of Jim's briefs sought—or even mentioned— any community interest in LBS under *Pereira.*

The trial court's tentative statement of decision found "LBS was acquired by Laurie before marriage and, although it grew during the marriage, its separate character did not change." Accordingly, the tentative statement of decision confirmed LBS as

---

[7] Leith testified he would limit the reimbursement claim to the value of LBS.

8

Laurie's sole and separate property. In a footnote, the trial court rejected "Laurie's contention" that LBS was "a community asset and/or that a *Pereira* interest should apply to LBS." The trial court explained: "[A] fair reading of *Pereira* supports the view that where more than minimal community effort combines with a separate capital investment to increase the value of the separate investment, the court must determine the amount of the increase attributable to the capital, and the amount attributable to community effort." (See generally *Dekker, supra*, 17 Cal.App.4th at p. 852.) Although the trial court acknowledged that "community efforts were substantial," the court observed there was "no identifiable capital investment by Laurie." "Under these circumstances," the trial court tentatively concluded, "and seeing as Jim is not seeking any apportionment (or making any community claim at all) regarding LBS, the Court declines to apply *Pereira*."

Jim objected to this part of the trial court's tentative statement of decision. He maintained he had "always claimed a community property interest in LBS and an apportionment of LBS," but acknowledged the apportionment claim "was secondary to his primary claim that he was entitled to all of the assets/value of LBS pursuant to . . . [section] 2640." Jim asked that the trial court apply *Pereira* to apportion the community interest in LBS.

As noted, the trial court issued a final statement of decision on March 25, 2022. The final statement of decision contains the same analysis of LBS as the tentative statement of decision. However, the final statement of decision includes a revised footnote, stating: "Jim's closing arguments make no mention of apportionment (or any community claim at all) in LBS. There is no question that LBS grew during the marriage due to substantial community efforts. Applying *Pereira*, the community interest in LBS would be $595,299 and thus each spouse's one-half interest would be $297,649.50. This would mean that, in awarding LBS to Laurie, she would owe Jim an equalization payment of $297,649.50. Because this scenario would change the Court's analysis under Family Code sections 2030 and 2032 (need-based attorney fees)—namely it would result

9

in different findings by the Court, to a limited extent, relative to Laurie's need for and/or the overall appropriateness of such an award—and thus it would result in the Court awarding attorney fees to Laurie in the sum of $297,649.50 (as just and reasonable under the parties' relative circumstances as a whole), the Court has herein awarded LBS to Laurie without ordering division of the community's interest in LBS."[8]

Jim argues the trial court should have applied the *Pereira* approach to apportionment of LBS and ordered Laurie to make an equalization payment for his community interest. Laurie argues the trial court abused its discretion by linking Jim's untimely request for equitable apportionment of LBS to her request for an additional award of need-based fees.

## C. Need-Based Attorneys' Fees and Costs

Attorneys' fees and costs for both sides were paid by Sopwith Farms. They soon became a significant expense. By the time of trial, Laurie and Jim had together incurred approximately $1.5 million in attorneys' fees and costs. By the time of the final statement of decision, that number approached—or perhaps even exceeded—$2 million.

Both sides sought attorneys' fees and costs in the trial court. Laurie, while acknowledging that attorney's fees and costs through April 27, 2021, had already been paid or reimbursed by Sopwith Farms, sought an additional award of $305,199 for fees and costs incurred from that date forward. Jim urged the trial court to deny Laurie's request for additional attorney's fees and costs. Instead, Jim said, the trial court should order Laurie to reimburse Sopwith Farms "for the funds advanced to her during litigation" in the amount of $692,911. The trial court denied both requests.

Jim appeals from the trial court's denial of his request for reimbursement. He argues Laurie's attorney's fees and costs were post-separation debts, which should have

---

[8] The trial court found Jim's claim for reimbursement of capital contributions to LBS was unsupported by the evidence.

been confirmed to her pursuant to section 2623. He also argues Sopwith Farms was entitled to reimbursement of Laurie's attorney's fees and costs under section 2626 and *In re Marriage of Epstein* (1979) 24 Cal.3d 76. As mentioned, Laurie argues the trial court should have revisited the decision to deny her request for an additional award of need-based attorney's fees and costs upon correcting the computation error described above.

D.      *Sanctions Against Laurie*

Jim presented evidence that Laurie engaged in various acts of pretrial misconduct. As relevant here, the evidence showed Laurie removed physical records from Sopwith Farms' office and placed them in a locked storage facility without telling Jim. The evidence also showed that Laurie surreptitiously accessed Jim's computer, limited Jim's access to Sopwith Farms' electronic records, and refused to give him blank checks from Sopwith Farms' checkbook. She also secretly withdrew $156,758 from a joint savings account, and deposited the money in a newly opened separate account.

Jim sought sanctions under various provisions of the Family Code, including sections 271, 1101, and 2107, subdivision (c). Relying on the above-mentioned evidence, the trial court found Laurie's conduct "discouraged cooperation between the parties" and "fell below the standard of good faith and fair dealing required between spouses in a dissolution case." Accordingly, the trial court entered an award of attorney's fees and costs against Laurie in the amount of $25,000 pursuant to section 271. The trial court declined to award sanctions for breaches of fiduciary duty under section 1101, "because the evidence does not establish that any of the alleged conduct impaired Jim's overall interest in the community estate." The trial court did not address the possibility of sanctions under section 2107, subdivision (c). Jim argues the trial court had a mandatory duty to sanction Laurie under section 2107, subdivision (c).

E.      *Sanctions Against Laurie's Trial Counsel*

Jim also sought sanctions pursuant to Code of Civil Procedure section 128.5 against Laurie's trial counsel (and one of her attorneys herein), Sally K. Callahan. He

11

argued Callahan countenanced Laurie's attempt to conceal records from him, and misrepresented Laurie's compliance with his requests for records to the trial court. The trial court denied the request, stating: "The evidence presented by Jim overall is enough to (1) show that Ms. Callahan was copied on emails in which Laurie revealed her (Laurie's) covert actions and plans to conceal records from Jim and (2) raise a question regarding whether Ms. Callahan misrepresented the status of the records at the subsequent court hearing and/or regarding whether any such misrepresentation was purposeful or not. This is not enough, under any standard of proof, to validate Jim's very serious claims." Jim argues the trial court erred in denying his request for sanctions against Callahan.

## II. DISCUSSION

### A. Jim's Appeal

Jim raises four issues on appeal. First, he argues the trial court should have ordered Laurie to make an equalization payment in the amount of $297,649.50 for his community interest in LBS. Second, he argues the trial court should have ordered Laurie to reimburse Sopwith Farms for attorney's fees and costs in the amount of $692,911. Third, he argues the trial court should have sanctioned Laurie for breaches of fiduciary duty. Finally, he argues the trial court should have sanctioned Laurie's trial counsel. We take these arguments in turn.

#### 1. Equalization Payment for LBS

Jim argues the trial court should have ordered Laurie to make an equalization payment for his share of the community interest in LBS. He emphasizes the trial court found "substantial community efforts" contributed to LBS's increased value. He observes "California courts are bound to divide the community estate equally between the parties." (See *In re Marriage of Cooper* (2008) 160 Cal.App.4th 574, 580 ["except as otherwise agreed by the parties or specifically provided by statute, no trial court has discretion to divide the community estate unequally and if it does so, the trial court errs

12

as a matter of law"]; see also § 2550 [courts shall "divide the community estate of the parties equally"].)  From these premises, he reasons the trial court was required to order an equalization payment for LBS and lacked discretion to allow an offset of that amount for Laurie's need-based attorney's fees, as suggested by the final statement of decision.  Laurie acknowledges the trial court's error, but argues it was invited.  We agree with Laurie.

An error is invited when a party purposefully induces the commission of error.  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)  The doctrine of invited error bars review on appeal based on the principle of estoppel.  (*Ibid.*)  The doctrine is intended to prevent a party from leading a trial court to make a particular ruling, and then profiting from the ruling in the appellate court.  (*Ibid.*)  Accordingly, the doctrine of invited error requires "affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party."  (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 706.)  Such affirmative conduct appears on the record before us.

As previously discussed, the parties devoted most of their time and attention to Sopwith Farms.  From the beginning, Jim argued Sopwith Farms was his separate property, and any increase in value should be apportioned using the *Van Camp* approach.  LBS was another story.  Although Jim consistently argued LBS was Laurie's separate property, he advanced several different arguments so far as apportionment was concerned.  Those arguments included the one raised here—that Jim was entitled to an equalization payment for his share of the community interest in LBS.  But that argument soon gave way to another, more frequently and vigorously asserted position—that Laurie should reimburse Jim for his separate property contributions to LBS pursuant to section 2640.  Jim now contends his changing positions at trial were offered as arguments in the alternative.  While that may have been true at the beginning of the trial, it was no longer so at the end.

13

As we have explained, Jim included a discussion of the *Van Camp* and *Pereira* approaches to apportionment of LBS in his trial brief. He advocated for application of the *Van Camp* approach, stating: "Jim does not believe there is any community interest in LBS," and "Jim concedes LBS is entirely Laurie's separate property." He then discussed the *Pereira* approach. He wrote: "The *Pereira* apportionment method has the consequence of awarding Jim half the value of LBS," and "LBS is currently valued at $595,299, so Jim would receive an equalization from Laurie for $297,649.50 under a *Pereira*" approach. Had these been the last words on the subject, we might have agreed that Jim argued in the alternative for application of the *Pereira* approach to apportionment of LBS. But they were not.

Again, Jim immediately filed a supplemental trial brief, describing another set of proposals for LBS. In the first of these, LBS would be allocated entirely to Laurie with no community interest to divide. In the second, LBS would be allocated entirely to Laurie, and the trial court would enter an award to Jim in the amount of $595,299 (its entire value on the stipulated date) as reimbursement for Sopwith Farms' separate property contributions to that entity. (§ 2640.) The supplemental trial brief declared: "Jim's formal position has been that all reimbursements between the parties should [be] offset against each other and zeroed out, which would be a benefit to Laurie of $595,299." The supplemental trial brief did not request or even mention equitable apportionment of LBS under the *Pereira* approach. In fact, Jim would not raise the subject again until he filed his objections to the trial court's tentative statement of decision, more than 10 months later.

Jim's trial presentation was consistent with the approach described in the supplemental trial brief. His trial counsel argued LBS was Laurie's separate property, but Sopwith Farms made separate property contributions to LBS which should be reimbursed pursuant to section 2640. Jim and his forensic accountant, Leith, testified to much the

14

same thing. No one said anything to suggest Jim was claiming a community interest in LBS.

Jim's closing brief followed the same course. The closing brief recapped the evidence regarding Sopwith Farms' separate property contributions to LBS and argued for reimbursement pursuant to section 2640. It ended with proposed dispositions for several disputed issues, including the following: "Jim asks the Court to find LBS is Laurie's separate property, but that the entire value of the asset be owed to Jim pursuant to [section] 2640." The closing brief proposed no alternative disposition involving apportionment of LBS using the *Pereira* approach. Indeed, that possibility was not mentioned anywhere in Jim's closing brief. But it was mentioned in Laurie's.

As noted, Laurie's closing brief argued for apportionment of LBS under the *Pereira* approach as an alternative to her primary theory that LBS and Sopwith Farms were "one farm," which should be characterized as community property. Had Jim wanted to seek equitable apportionment of LBS under the *Pereira* approach, even in the alternative, he would have said as much in response to Laurie's closing brief. But again, he said nothing.

When all is said and done, the record reveals that Jim entertained the possibility of claiming a community interest in LBS under the *Pereira* approach, then immediately changed course, choosing instead to pursue the entire value of LBS as a section 2640 reimbursement. He then participated in a 20-day trial, at which he presented no evidence of any community interest in LBS under *Pereira.* He submitted nearly three hundred pages worth of post-trial briefing, none of which so much as hinted at any such claim. Having chosen to embrace one set of arguments, and forsake another, Jim cannot be heard to complain that the trial court gave short shrift to the forsaken ones. It was not the trial court's job to scour the briefs for abandoned arguments. The error, if any, was the direct result of Jim's deliberate trial strategy. As such, we decline to review it. (*Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 377 [" '[w]here a

15

deliberate trial strategy results in an outcome disappointing to the advocate, the lawyer may not use that tactical decision as the basis to claim prejudicial error' "].)

### 2.    *Reimbursement for Attorneys' Fees*

Towards the beginning of the dissolution proceedings, the trial court authorized both sides to use community funds to pay attorneys' fees and costs pursuant to section 2040, subdivision (a)(2)(B).  Those fees and costs were paid by Sopwith Farms.  Jim argues the trial court should have ordered Laurie to reimburse him for amounts paid towards her attorney's fees and costs (some $692,000), as Sopwith Farms was ultimately found to be his separate property.  He argues Laurie's attorney's fees and costs were postseparation debts within the meaning of sections 903 and 913 and should have been confirmed to her and reimbursed pursuant to sections 2623 or 2626.  Jim's argument fails.

Attorneys' fee awards in marital dissolution proceedings are governed by two sources of statutory authority.  (Hogoboom & King, Cal. Practice Guide:  Family Law (The Rutter Group 2025) ¶ 14:2.)  Sections 2030 and 2032 authorize the trial court to award need-based attorneys' fees and costs.  (See *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 111.)  Section 271 authorizes the trial court to assess fees and costs as a sanction.  We are concerned here with sections 2030 and 2032.

Section 2030 authorizes the trial court in a dissolution proceeding to order one party to pay the other party's attorney's fees and costs.  (§ 2030, subd. (a)(1).)  Section 2030, subdivision (a)(2) requires the trial court to "make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties."  Section 2030 reflects the public policy of providing, " ' " 'consistent with the financial circumstances of the parties, a parity between spouses in their ability to obtain effective legal representation.' " ' " (*In re Marriage of Sharples* (2014) 223 Cal.App.4th 160, 164.)

16

Section 2032, subdivision (a) requires the trial court to consider whether the award of attorneys' fees is "just and reasonable under the relative circumstances of the respective parties."  That determination includes consideration of "the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately."  (§ 2032, subd. (b); accord *In re Marriage of Bendetti* (2013) 214 Cal.App.4th 863, 868 ["In deciding whether to award attorney fees, the trial court considers the parties' respective needs and incomes, including their assets and liabilities"].)  It also includes consideration of the factors for determining spousal support set forth in section 4320 "to the extent relevant."  (§ 2032, subd. (b).)  Of particular significance here, section 2032, subdivision (c) authorizes the trial court to "order payment of an award of attorney's fees and costs from any type of property, whether community or separate, principal or income."  The trial court has "very broad discretion" in ordering the payment of attorneys' fees from any type of property.  (*In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 460.)

Jim's opening brief does not discuss sections 2030 and 2032 at all, let alone attempt to show that the trial court abused its "very broad discretion" in ordering payment of Laurie's need-based fees and costs from Sopwith Farms.  Any challenge to the trial court's exercise of discretion under sections 2030 and 2032 is therefore forfeited. (*Golden Door Properties, LLC v. Superior Court* (2020) 53 Cal.App.5th 733, 786 ["issues not addressed as error in a party's opening brief with legal analysis and citation to authority are forfeited"].)[9]

---

[9] Jim's reply brief posits a statutory conflict between sections 2623 and 2626, on the one hand, and sections 2030 and 2032, on the other.  We do not consider arguments raised for the first time in a reply brief. (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2 ["New arguments may not be raised for the first time in an appellant's reply brief"].)

17

### 3. Sanctions Against Laurie for Breach of Fiduciary Duty

Jim next argues the trial court erred in failing to sanction Laurie pursuant to section 2107, subdivision (c). He argues the evidence "clearly established that Laurie had breached her fiduciary duties to him," and concludes that sanctions were mandatory under the statute. We disagree.

#### a. Additional Background

Jim sought sanctions pursuant to several statutes. First, he argued for attorney's fees and costs in the nature of a sanction under section 271. Section 271 is not a specific remedy for breach of fiduciary duty, but a "sanction for uncooperative conduct that frustrates settlement and increases litigation costs." (*In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 290.) The trial court sanctioned Laurie for attorney's fees and costs in the amount of $25,000 under section 271. Neither party challenges that award.

Jim also sought sanctions against Laurie under sections 721 and 1101. "Section 721 . . . creates a broad fiduciary relationship between spouses in their transactions with each other. This relationship 'imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.' " (*In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 590.) "Section 1101 creates a right of action and specific remedies for the breach of a spouse's fiduciary duty 'that results in impairment to the claimant spouse's present undivided one-half interest in the community estate.' " (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 277.) Jim argued Laurie breached her fiduciary duties in several ways. Specifically, he argued Laurie breached fiduciary duties by removing boxes of physical records from Sopwith Farms' offices and "sequestering" them in a locked storage facility, spoliating certain Sopwith Farms' records, limiting Jim's access to Sopwith Farms' electronic books and records (e.g., QuickBooks), refusing to give Jim blank checks from Sopwith Farms' checkbook, and clandestinely accessing his computer. The trial court denied Jim's request for sanctions under sections 721 and 1101, ruling the evidence failed to show the alleged breaches

18

impaired Jim's interest in the community estate. Jim does not dispute this determination. Instead, he argues the trial court should have sanctioned Laurie pursuant to section 2107, subdivision (c).

"Section 2107, subdivision (c) requires the trial court to impose monetary sanctions and award reasonable attorney fees if a party fails to comply with any portion of the chapter of the Family Code that deals with a spouse's fiduciary duty of disclosure during dissolution proceedings, i.e., sections 2100 to 2113. The statute provides, 'If a party fails to comply with any provision of this chapter, the court shall, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party. Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust.' (§ 2107, subd. (c).)" (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1477 (*Feldman*).)

Jim excerpted section 2107, subdivision (c) in his closing brief and response to Laurie's closing brief. However, neither brief suggested Laurie breached any duty of disclosure under "the chapter of the Family Code that deals with a spouse's fiduciary duty of disclosure during dissolution proceedings, i.e., sections 2100 to 2113." (*Feldman, supra*, 153 Cal.App.4th at p. 1476.) Nor did either of Jim's briefs request such a finding. Not surprisingly, the trial court's tentative statement of decision did not discuss the possibility of sanctions under section 2107, subdivision (c).

Jim objected to the tentative statement of decision for "lack of adequate grounds for the denial of sanctions against Laurie for breaches of fiduciary duties (and oppression, fraud, or malice)." (Emphasis omitted.) As before, Jim generally referred to section 2107, subdivision (c), but did not argue that Laurie violated any duty described in sections 2100 through 2113, and did not request any finding to that effect.

19

The trial court's final statement of decision states: "Laurie admittedly 'sequestered' 20+ boxes of records, clandestinely accessed Jim's computer (at the Eastern Avenue office), knowingly limited Jim's access to the day-to-day books (QuickBooks) for Sopwith Farms and/or historical or other financial records for Sopwith Farms that were stored electronically, and blatantly refused to give Jim any blank checks from the Sopwith Farms checkbook, during periods in this dissolution action. Her conduct in this regard discouraged cooperation between the parties, and it fell below the standard of good faith and fair dealing required between spouses in a dissolution case." (Fn. omitted.) The final statement of decision does not discuss the question of sanctions under section 2107, subdivision (c) either.

b.      *Standard of Review*

Several standards of review are potentially relevant here. First and foremost, we review an order granting or denying sanctions under section 2107 for abuse of discretion. (*Feldman, supra*, 153 Cal.App.4th at p. 1478.) However, the availability of sanctions here turns on whether Laurie breached any of the fiduciary duties set forth in sections 2100 through 2113. (§ 2107, subd. (c).) Whether a breach of fiduciary duty has occurred is a factual question, which we review for substantial evidence. (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144.)

c.      *Analysis*

Jim argues the trial court erred in failing to sanction Laurie pursuant to section 2107, subdivision (c). He maintains there was "no question that Laurie breached her fiduciary duties," and concludes sanctions were "mandatory" under section 2107, subdivision (c). Jim's argument fails for lack of a predicate.

An award of sanctions under section 2107, subdivision (c) requires a finding that the party to be sanctioned breached one of the fiduciary duties set forth in sections 2100 through 2113, most of which deal with the parties' obligations with respect to declarations of disclosure. (See, e.g., §§ 2100, 2104, & 2105.) But the trial court made

20

no findings regarding Laurie's compliance or noncompliance with any of the duties set forth in sections 2100 through 2113. The trial court made findings that might have been relevant to the question whether Laurie breached duties to Jim under sections 2100 through 2113 but made no specific findings on that score. For example, the trial court found Laurie's uncooperative litigation conduct "fell below the standard of good faith and fair dealing required between spouses in a dissolution case." But that is not the same as a finding that she breached any of the fiduciary duties set forth in sections 2100 through 2113. (See generally *In re Marriage of Duffy* (2001) 91 Cal.App.4th 923, 937, superseded by statute on other grounds as stated in *In re Marriage of Walker* (2006) 138 Cal.App.4th 1408, 1425 [" 'Good faith' and fiduciary duty are not coextensive"].)[10] Furthermore, Jim does not appear to have asked the trial court to make any such findings in the final statement of decision, and his failure to do so precludes us from implying them. (See generally *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 556-560.) In the absence of any finding that Laurie breached a duty described in sections 2100 through 2113, we have no basis for concluding that sanctions were required under section 2107, subdivision (c). We therefore reject the claim of error.

    4.      *Sanctions Against Laurie's Trial Counsel*

Finally, Jim argues the trial court erred in denying his request for sanctions against attorney Callahan pursuant to Code of Civil Procedure section 128.5. According to Jim, the evidence was "uncontroverted" that Callahan facilitated various acts of misconduct by Laurie (including the "sequestering" of Sopwith Farms' physical books and records in a locked storage facility) and then breached her duty of candor to the trial court by representing that no such acts had occurred. The argument fails.

---

**10** Jim argues for the first time in his reply brief that Laurie breached section 2102, subdivision (a), which incorporates section 721. Again, we do not consider arguments made for the first time in a reply brief.

### a. Applicable Legal Principles and Standard of Review

Code of Civil Procedure section 128.5, subdivision (a) provides, in pertinent part: "A trial court may order a party, the party's attorney, or both, to pay the reasonable expenses, including attorney's fees, incurred by another party as a result of actions or tactics, made in bad faith, that are frivolous or solely intended to cause unnecessary delay." "Whether an action is frivolous is governed by an objective standard. But the statute also requires a finding of subjective bad faith, i.e., 'a showing of an improper purpose' [citation], to support a sanctions award." (*Orange County Dept. of Child Support Services v. Superior Court* (2005) 129 Cal.App.4th 798, 804.) "[T]o impose sanctions under [Code of Civil Procedure] section 128.5, there must be a showing the action or tactic was meritless or frivolous *and* that it was pursued in bad faith." (*Shelton v. Rancho Mortgage & Investment Corp.* (2002) 94 Cal.App.4th 1337, 1346.)

"On appeal, we presume the trial court's order denying a request for sanctions pursuant to [Code of Civil Procedure] section 128.5 is correct, and the standard of review is abuse of discretion. ' " 'Where the issue on appeal is whether the trial court has abused its discretion, the showing necessary to reverse the trial court is insufficient if it presents facts which merely afford an opportunity for a different opinion: "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge. To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice." ' " ' " (*Shelton v. Rancho Mortgage & Investment Corp., supra*, 94 Cal.App.4th at pp. 1345-1346.)

### b. Analysis

Jim primarily argues that Callahan engaged in sanctionable conduct by facilitating Laurie's concealment of Sopwith Farms' physical records. He points to a series of emails between Laurie and Callahan. In the first email, dated June 20, 2019, Laurie was asked to review a draft of a meet and confer letter from Callahan to Jim's attorney. The draft

discussed several issues, including Jim's requests for access to physical and electronic business records. As relevant here, the draft said that Laurie kept "at least 20" bankers' boxes of records at home and in a storage facility. The draft indicated that Laurie was preparing an inventory of the physical records, and suggested ways in which they might be copied or otherwise made available to him. The draft then discussed efforts to make electronic records available to Jim through DropBox. Laurie responded to the email right away, with instructions to hold off on sending the draft.

She sent another email several hours later, in which she explained: "I do not think Jim knows I have a storage facility let alone that I have any records from the ranch office in it. I certainly don't want to highlight it or bring it to his attention. I made more than one clandestine trip to the ranch office to retrieve seven years of payables and banking records, Jim's diaries, those yearly crop binders (I showed you the sample), insurance binders (you mentioned those might be helpful some time ago), my old law office records and more stuff I can't remember right now. I sequestered records because I was afraid I would need them to prove this is all One Community Enterprise. Jim is so volatile I felt I would be locked out of the ranch office at any time. Before I got the storage unit, a couple of my friends stored boxes of records for me. And once I got the storage unit, I boxed up records from the home office because I was afraid Jim would come when I was not home and take them. Aghhhh. I do not apologize for doing this as I had plenty of warnings to take protective action." She then discussed the possibility of hiring a copy service to duplicate the records and whether she should await a formal document request before doing so.

Laurie sent Callahan an email attaching proposed revisions to the draft letter the next morning. She wrote: "My suggested edits leave open what I am doing about Jim's demand for documents. I am hoping you can think of something else to say like 'I will be working on a plan with Laurie which may involve a copy service[.]' " She then attached a copy of the draft with handwritten changes, which included interlineations

23

deleting the discussion of physical records in bankers' boxes at a storage facility. Callahan sent the letter as revised by Laurie.

The parties appeared for a hearing on Jim's request for orders for breach of fiduciary duties on July 31, 2019. Jim's trial counsel spoke at some length, arguing that the parties could no longer work together, and Jim should have sole control of Sopwith Farms. Among other things, Jim's trial counsel said: "She's been refusing to turn over records. She won't show Jim the accounting and the QuickBooks for his subentity. She's refusing to allow his business documents to be moved to a neutral site." Callahan responded at length, stating: "All the records counsel sits here and tries to tell you that [Jim] doesn't have, he has. He has realtime of all the ongoing records of all the entities. Nothing's withheld from him." Moments later, Callahan observed: "We also know [section] 721 of the Family Code requires mutual fiduciary duties, confidential relationships, ongoing disclosures, ongoing efforts of transparency. That's required. We're doing it." The trial court ruled, "[Jim] shall have full access to all business records, bank account records, QuickBooks online, in the Cloud, or in other location and any other records relating to the business."

Jim does not argue Callahan failed to comply with the trial court's order. Instead, he says Callahan countenanced Laurie's concealment of records and then lied to the trial court about it. But the trial court could reasonably read the email exchange with Laurie in a different light. Although Laurie acknowledged making "more than one clandestine trip" to collect records from Sopwith Farms and recognized that Jim was likely unaware of the storage facility, she did not say she planned to keep the records under wraps indefinitely. To the contrary, Laurie's email suggests she understood that copies would eventually need to be given to Jim. The trial court could reasonably conclude that Callahan, in accepting Laurie's revisions to the meet and confer letter, only agreed to delay discussion of the records kept at the storage facility. The trial court was not compelled to conclude that Callahan participated in any breach of fiduciary by her client.

24

The trial court was not compelled to conclude that Callahan breached her duty of candor, either. Jim argues that Callahan must have been lying when she assured the trial court that he already had all the records said to be missing. But the trial court could have reasonably understood Callahan to have been referring to electronic records, which Laurie appears to have made available to Jim, albeit not to the extent he may have wanted. Unlike *Young v. Rosenthal* (1989) 212 Cal.App.3d 96, on which Jim relies, nothing in the record establishes that Callahan "knowingly lied to the court, acquiesced in [her] client's demands, and actively supported frivolous motions." (*Id.* at p. 128.) We are therefore unable to say that sanctions were "absolutely mandatory." (*Ibid.*) The trial court did not abuse its discretion in denying Jim's bid for sanctions against Callahan.

B.     *Laurie's Cross-Appeal*

Laurie's cross-appeal raises two principal issues.[11] First, Laurie argues the trial should have reconsidered its decision to deny her request for additional need-based attorney's fees after correcting the computational error in the tentative statement of decision and abused its discretion in failing to do so. Second, she argues the computational error should have prompted the trial court to reconsider the rate of return used to determine Jim's separate property capital contributions to Sopwith Farms. Neither argument has merit, as we explain below.

1.     *Additional Award of Need-Based Attorney's Fees*

Laurie argues the trial court abused its discretion by refusing to reconsider its decision to deny her request for an additional award of need-based attorney's fees. She emphasizes that need-based attorneys' fees are designed to ensure a level playing field between the parties, and insists that any balance the trial court may have struck in the

---

[11] Laurie raised another argument in her opening brief—that the trial court erred in failing to reimburse her for separate property contributions to the marital home. She has since withdrawn that argument.

25

tentative statement of decision was changed when the court corrected the computational error in the final statement of decision. At that point, Laurie says, the trial court should have reconsidered and presumably reversed its decision to deny her request for additional need-based fees. Laurie fails to establish reversible error.

### a. *Additional Background*

To reiterate, Sopwith Farms paid Laurie's attorney's fees and costs through trial to the tune of $692,911. Laurie sought an additional award of need-based attorney's fees in her closing brief. She generally argued she should receive all her attorney's fees and costs, given Jim's greater income and earning power. She did not specify the amount of the additional award sought or provide any information concerning attorney's fees and costs incurred post-trial.

The trial court tentatively denied Laurie's request for an additional award of need-based fees.[12] The trial court's tentative statement of decision observed that: "Leveling the playing field is a key consideration under . . . section 2030." The trial court also acknowledged that Jim's income was greater than Laurie's, and he had the ability to pay additional need-based attorney's fees on her behalf. Nevertheless, the trial court tentatively concluded that ordering Jim to pay such additional fees was "not necessary (for Laurie), just (for Jim), or appropriate (in any way) at this time."

As noted, the tentative statement of decision contained a computational error that made the community's interest in Sopwith Farms appear more valuable than it was.[13] Both sides objected to the tentative statement of decision. Laurie's objections included

---

[12] The tentative statement of decision also denied Jim's request for reimbursement of Laurie's attorney's fees and costs to date.

[13] To reiterate, the trial court improperly subtracted the value of Sopwith Farms as of December 31, 2020 ($4,757,715) from Jim's total separate property interest ($6,777,622) and apportioned the balance ($2,019,907) to the community, resulting in an award of $1,009,953 to each spouse.

the unsupported assertion that she had incurred $305,199 in attorney's fees and costs as of or after the last day of trial.

The trial court corrected the computational error in the final statement of decision. One effect of the correction was to clarify that Laurie's community interest in Sopwith Farms was worth nothing, and not $1,009,953 as previously and incorrectly stated. The trial court expressed regret for the error, allowing that the amount was "monetarily significant." Nevertheless, the trial court found the correction did not require the court to change any of its other findings. Among those findings was the trial court's determination that an additional award of need-based fees was not warranted.

The trial court's final statement of decision continued to acknowledge the disparity in employment income between Jim and Laurie and recognize the importance of leveling the playing field in marital dissolution cases. But the final statement of decision also recognized that overlitigation may impact the reasonableness and appropriateness of an award. The trial court found that "*each* party currently has access to individual financial accounts (with sizeable sums of money) and substantial assets," and "*both* parties contributed to the excessive litigation (and related fees/costs) overall in this case." However, the trial court further found that "Laurie's role in over-litigating at and after trial is not negated and weighs heavily against the appropriateness of any such award." Accordingly, the trial court denied Laurie's request for an additional award of need-based fees.

> b.    *Applicable Legal Principles and Standard of Review*

As we have explained, need-based attorneys' fee awards in marital dissolution proceedings are governed by sections 2030 and 2032. (*In re Marriage of Ciprari, supra*, 32 Cal.App.5th at p. 111.) Section 2030 authorizes the trial court to order one party to pay the other party's attorney's fees and costs. (§ 2030, subd. (a)(1).) Subdivision (a)(1) of section 2030 provides that "the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights

by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." Subdivision (c) of section 2030 requires that the trial court "augment or modify the original award for attorney's fees and costs as may be reasonably necessary for the prosecution or defense of the proceeding, or any proceeding related thereto." (See *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1056 (*Cryer*) [" 'No single fees and costs order is an "all or nothing" proposition. Need-based awards may be augmented or modified as necessary during the entire pendency of the case' " (italics omitted).]

"In ruling on a request for fees and costs under section 2030, the court is guided by section 2032, which provides that an award of fees and costs under section 2030 may be made 'where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.' " (*In re Marriage of Sharples, supra,* 223 Cal.App.4th at pp. 164-165 [quoting § 2032, subd. (a)].) "In determining what is just and reasonable, 'the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately.' " (*Id.* at p. 165 [quoting § 2032, subd. (b)].) "In addition to the parties' financial resources, the court may consider the parties' trial tactics. (*Ibid.*) The party seeking the award bears the burden of establishing his or her need for attorney's fees in light of the parties' relative financial positions. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 824.)

A trial court's decision whether to award need-based attorney's fees under sections 2030 and 2032 requires that it "resolve questions of law, make findings of fact, and exercise discretionary authority to resolve certain issues. Each of these aspects of the [trial] court's decision is subject to a different standard of review." (*In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 25.) We review questions of law de novo, factual

findings for substantial evidence, and discretionary determinations for abuse of that discretion. (*Ibid.*) As always, the trial court's decision is "presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) In addition, we will not reverse by reason of any error by the trial court unless the record shows the error was prejudicial and a different result would have been probable absent the error. (*In re E.M.* (2014) 228 Cal.App.4th 828, 852.)

###### c.    *Analysis*

Laurie argues the trial court erred in refusing to reconsider its decision to deny her request for an additional award of need-based fees. She observes the trial court purported to level the playing field in the tentative statement of decision but changed the playing field upon correcting its computational error in the final statement of decision. She argues the change should have prompted the trial court to reevaluate the parties' relative circumstances and reconsider the decision to deny the request for additional need-based fees. Laurie's argument places undue emphasis on the trial court's tentative statement of decision and ignores our standard of review and the reality of the situation before the court.

The trial court granted Laurie's original request for need-based fees, which were paid by Sopwith Farms through trial. Laurie then sought an additional award of need-based fees, in an unspecified amount, in a closing brief filed more than four months later. Laurie now argues sections 2030 and 2032 required the trial court to award need-based fees, given the disparity in the parties' access to funds and ability to pay. But the question before the trial court was not whether Laurie should receive an award of need-based attorney's fees in the first instance—that question had already been answered in the affirmative. The question, rather, was whether she should receive an additional award of need-based fees, over and above the original award. That question is addressed in section

29

2030, subdivision (c), which directs the trial court to "augment or modify the original award for attorney's fees as . . . reasonably necessary for the prosecution or defense of the proceeding." (See *Cryer, supra*, 198 Cal.App.4th at p. 1056.)

Laurie does not discuss section 2030, subdivision (c) at all, let alone attempt to show that an additional award of need-based fees would have been "reasonably necessary" for the prosecution or defense of the proceeding (which was by then essentially over). Indeed, no such showing appears possible on the present record, as Laurie failed to support her request with any of the information required by California Rules of Court, rule 5.427. (Cal. Rules of Court, rule 5.427(b)(2) ["The party requesting attorney's fees and costs must provide the court with sufficient information about the attorney's hourly billing rate; the nature of the litigation; the attorney's experience in the particular type of work demanded; the fees and costs incurred or anticipated; and why the requested fees and costs are just, necessary, and reasonable"]; see also *In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th at p. 824 ["In order to make an award of attorney's fees under . . . section 2032 the trial court must have some evidence that the moving party needs the money"]; and see *Straub v. Straub* (1963) 213 Cal.App.2d 792, 799 ["The burden of establishing such necessity is upon the applicant"].) That being so, we are compelled to conclude that Laurie failed to carry her burden in the trial court and fails to demonstrate error on appeal.

In the absence of an adequate record, Laurie expounds upon the computational error and emphasizes differences between the tentative and final statements of decision. These arguments do not change our conclusion. It is true, as the trial court acknowledged, that the computational error was "monetarily significant." It is also possible, or perhaps probable, that a "monetarily significant" change in the parties' relative circumstances would change the playing field between them. But again, the question before the trial court was not whether a disparity in earning power or access to funds necessitated an award of need-based fees in the first instance, but whether

30

additional fees were "reasonably necessary for the prosecution or defense of the proceeding." (§ 2030, subd. (c).) The trial court implicitly found they were not, and substantial evidence supports that conclusion. (See, e.g., *In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457, 469 [" 'The court should limit an award to fees that were reasonably necessary, including by taking into account overlitigation' "]; and see *In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 576 ["services which have no apparent effect other than to prolong and to complicate domestic litigation cannot be deemed 'reasonably necessary' "].) Laurie does not suggest otherwise. She therefore fails to establish grounds for reversal.

2.      *Assumptions Underlying the Trial Court's Application of the* Pereira
        *Approach*

Finally, Laurie argues the trial court erred in selecting and calculating the rate of return on Jim's separate property investment in Sopwith Farms. As before, she argues the trial court's computational error should have prompted the trial court to reconsider the assumptions underlying its application of the *Pereira* approach. Laurie again fails to establish error.

a.      *Additional Background*

As noted, the trial court found the value of Sopwith Farms was $429,970 at the date of marriage and $4,757,715 as of December 31, 2020; an increase in value of $4,327,745. The trial court further found that Jim made capital contributions to Sopwith Farms from his separate property in the amount of $1,158,973. The trial court selected the *Pereira* approach to equitable apportionment, which called for apportionment of Jim's capital contributions to Sopwith Farms to separate property, plus a fair rate of return from the date of marriage. The trial court then turned to the question of what rate of return to apply.

Laurie's forensic accountant, Harms, opined that five percent simple interest would be a fair rate of return. Jim's forensic accountant, Leith, countered that Jim

31

received between seven and 10 percent compound interest on other long term investments, and opined that seven percent compound interest would be a fair rate of return for his separate property contributions to Sopwith Farms.

The trial court relied on Leith's opinion, finding it was "more tailored, detailed, and realistic to the facts of this case." Applying the seven percent compound interest rate of return, the trial court found Jim's separate property interest in Sopwith Farms was $6,777,622.

> b. *Applicable Legal Principles and Standard of Review*

*Pereira* does not specify any particular rate of return. (*Pereira, supra*, 156 Cal.1 at p. 7.) Instead, *Pereira* instructs that the rate of return should be "determined from all the circumstances of the case" and should "amount at least to the usual interest on a long investment well secured." (*Ibid.*) That rate has frequently been fixed at seven percent simple interest. (*Somps v. Somps* (1967) 250 Cal.App.2d 328, 335.) However, the rate of return can be adjusted depending on the evidence. (See generally *Gilmore v. Gilmore* (1955) 45 Cal.2d 142, 150 [" 'Departures from the *Pereira* formula have been made when husband introduced evidence that "a larger return on his capital had in fact been realized" ' "].)

"We apply the abuse of discretion test to the court's application of *Pereira*." (*Dekker, supra*, 17 Cal.App.4th at p. 849.) To the extent findings of fact are challenged, we apply a substantial evidence standard of review. (*Ibid.*)

> c. *Analysis*

Laurie argues the trial court should have reconsidered its decision to apply a seven percent compound interest rate upon correcting the computational error in the final statement of decision. She insists: (1) the rate of return does not adequately reflect Sopwith Farms' cumulative losses for the years 1995 to 2009; (2) the trial court should not have accepted Leith's invitation to "add back in" depreciation to show that Sopwith Farms enjoyed positive income during those years; and (3) Leith's expert opinion was

32

unreliable.  These are all invitations to reweigh the evidence, which we cannot accept. They do not establish any abuse of discretion.

### III.  DISPOSITION

The judgment is affirmed.  Each side to bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


/S/

_____

RENNER, Acting P. J.


We concur:


/S/

_____

KRAUSE, J.


/S/

_____

FEINBERG, J.


33